Filed 2/14/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>    Respondent;<br><br>JOSHUA JAMES CORBETT,<br><br>    Real Party in Interest. | B276937<br><br>(Los Angeles County<br>Super. Ct. No. BA425880) |

        ORIGINAL PROCEEDINGS in mandate.  Edmund W. Clarke, Jr., Judge.  Petition denied.
        Jackie Lacey, District Attorney, Steven Katz, Phyllis C. Asayama and Scott D. Collins, Deputy District Attorneys, for Petitioner.
        No appearance for Respondent.
        No appearance for Real Party in Interest.

———————————————

In the absence of exigent circumstances, if the police could have obtained but did not obtain a warrant to search a person's residence, and entered the person's residence illegally based on an invalid consent, does the fact that they could have obtained a warrant, or later obtained a warrant when they wanted to return to search the home again, excuse their failure to obtain a warrant before the initial entry? The answer is no.

Here, an unarmed alleged stalker was arrested inside the home of his victim and then questioned extensively despite his repeated invocation of his right to remain silent. The police, aware from a records search that he had eight firearms registered in his name, continued to question him until he disclosed his address and the location where the guns could be found, and signed a form consenting to the search of his home. It is undisputed in this proceeding that the suspect's assent to the search was not a meaningful or valid consent.

The parties agree that the police had probable cause to obtain a search warrant before they entered the suspect's home, and there is no dispute that officers had the opportunity to seek a warrant but elected not to do so. They searched the suspect's home and seized numerous firearms and ammunition, including seven of the eight weapons listed in the firearms registration record. The following day, relying upon information gathered from the interrogation of the suspect and facts learned from their earlier search of his home, they obtained a search warrant for the suspect's home, identifying two objects of the search: a gun safe they saw during their initial entry, and the eighth firearm known to be registered to the suspect but not located during the warrantless search the day before.

The trial court suppressed the evidence collected in the initial search. The People seek a writ of mandate compelling the court to vacate its ruling and to deny the motion to suppress, arguing that because the police later obtained a warrant after the initial search, the evidence in the suspect's home would inevitably have been discovered. We deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

Joshua Corbett was arrested by officers of the Los Angeles Police Department inside the home of Sandra Bullock on the morning of June 8, 2014. He was charged with 26 offenses, two of which concern the stalking of Bullock and the burglary of her home; the remaining 24 counts are firearms-related offenses concerning weapons, ammunition, and parts that were recovered during the search of Corbett's home.

### A. The Incident, Arrest, Interrogation, and Initial Search

According to the affidavit of probable cause in the search warrant obtained on June 10, 2014, LAPD officers responded to Bullock's residence at 6:35 a.m. on June 8, 2014, in response to her report that a man wearing a dark sweatshirt and dark pants was inside her home. Officers arriving at the home found Corbett walking down the staircase. As he was detained, he called out, "Sandy," several times and said, "Sandy, I'm sorry. Please don't press charges." Corbett was arrested and taken into custody.

At the time of the arrest, according to the affidavit, Corbett possessed a letter addressed to Bullock, a notebook with multiple entries addressed to her, photographs of her from a magazine, and a Utah concealed weapons permit. Corbett was unarmed.

Officer Juan Rodriguez arrested Corbett. Later that day, Rodriguez obtained an emergency protective order; he served it on Corbett at 12:08 p.m. on June 8, 2014. Rodriguez failed to use the appropriate form for the emergency protective order, instead using a form that had been superseded. Corbett remained in police custody.

The following day, June 9, at approximately 10:00 or 10:15 a.m., Detective Jeffrey Dunn questioned Corbett in jail in the presence of Detective Christina Carlozzi, the primary detective assigned to the case; psychologist Scott Watson; and Detective Debbie Robles. At this time Corbett had been in custody for approximately 30 hours. He was handcuffed during the interrogation. He had not been given the opportunity to make a telephone call.

3

Prior to the interrogation, Dunn received the arrest records, the face sheet of the emergency protective order, and a CLETS document in response to an automated firearm system inquiry. The CLETS printout provides information on firearms registered to the subject of the report, and it indicated that handguns were registered to Corbett. Also at this time, according to Dunn, the terms of Corbett's "restrictions pursuant to the emergency protective order were available online," and he "based [the] interview off that information."[1] From the reports that were run, Dunn "learned that pursuant to the emergency protective order [Corbett] was restricted from possessing, owning, or having access to any firearm."

The interrogation was partially recorded. The recorded portion begins with one officer[2] advising Corbett of his *Miranda* rights. Without asking Corbett whether he wanted to waive those rights, the police asked Corbett, "So, do you—you want to talk about what happened with—with Sandy?" Corbett responded, "Not—not really. I don't want to talk about it. No." Dunn asked, "You don't want to help us understand why you were there?" and Corbett said, "Right, I don't want to talk about it."

Dunn responded, "Okay. Well, how about off the record? Do you want to talk about it off the record? We can't use anything that we've discussed." Corbett again stated that he did not want to talk about it.

Dunn then told Corbett that his letter to Bullock made him think that there was more to the story than what Dunn had heard, and that he did not "want to go to the District Attorney and file, you know, felony burglary charges on you, if there's another side of the story." Corbett acknowledged, "I did what I did. And I deserve to be punished for it." Dunn asked why

---

[1]     Neither the CLETS printout nor the portion of the emergency protective order concerning firearm restrictions actually served on Corbett appears in the record.

[2]     Dunn testified that the officer was Carlozzi, but the transcript indicates that it was Robles. The record on appeal does not include the recording of the interrogation. All quotations from the interrogation are taken from the transcript of the interrogation.

4

Corbett needed to be punished.  Corbett said, "Well, I did what I did.  I don't know.  I shouldn't have pushed the issue.  I don't want to talk about it."

Dunn changed the subject to the emergency protective order and firearms.  He said that he knew that Corbett had "a bunch of guns, right?" to which Corbett made a response characterized by the transcriber as "Mmnh-mmnh."  Dunn said, "So, we're gonna have to hold on to those guns until this thing gets resolved.  So, we can either go there with your permission and voluntarily, you know, surrender your guns."  Alternatively, Dunn told Corbett, "we're gonna have to write a search warrant, in which case we'll have to go into your house or your apartment and search the entire location until we find the weapons that we know you have there."

Dunn urged, "Just tell us where the guns are, and we can go get the guns.  Or we'll have to write a search warrant and we'll have to go, essentially, open everything and unlock everything until we find what we're looking for."  Corbett responded, "Mmnh-mmnh."

Dunn told him that "it's however you want to play it," but that "[i]t's a whole lot easier if you give us permission to get the guns, 'cause we're gonna get them one way or the other."  Corbett made the sound, "Mmnh-mmnh."

Dunn said, "[A]re you gonna tell us where the guns are and—and how we can get our hands on them?"  Corbett answered, "You guys do what you have to do.  I don't know what to tell you."

Dunn asked Corbett if he lived with his parents.   Corbett said, "Uh, no. I don't—I don't want to talk about it."  Dunn said, "You don't want to talk about anything?"  Corbett said no.

Dunn continued anyway, telling Corbett that this was his one chance to clear the air and tell his story.  He reminded Corbett that they had read his letter and his notes.  Corbett said, "I, obviously, got issues."  Dunn then began asking about Corbett's mental health history, which Corbett told the police was his own business.  Dunn responded that it was not exclusively Corbett's business because now he was in custody.  Corbett responded, "[S]he's an innocent victim.  And you guys do what you have to do.  That's all I have to say."

"An innocent victim of what?" Dunn asked, and Corbett began responding in a limited and brief manner to questions about Bullock and his

belief that she was not being protected adequately by her security staff. Corbett acknowledged being at Bullock's home and that he would be going to jail. He denied intending to hurt Bullock and said he was devastated that he had made her cry.

Dunn told Corbett that he knew Corbett was a good guy who had no prior felony convictions, because if he had convictions, he would not be permitted to have the handguns and long guns that he knew Corbett had. "Right?" asked Dunn. "Mmnh-mmnh," Corbett said.

Dunn asked more questions about Corbett's relationship with Bullock, and then returned to Corbett's weapons, saying, "So, what do you want me to do about your guns?" Corbett responded unintelligibly. Dunn said, "I need to get my hands on them until this whole thing is resolved. Okay?" Corbett did not reply.

Dunn told Corbett, "And you can get them back. But, we got to go through this whole process first. So, I can either go there with your permission, or I'll have to write a search warrant and I'll have to go there with a team and do what we got to do to find them." Corbett responded, "Can I make a phone call? I haven't had a phone call, yet."

Dunn told Corbett he could place a call after the interrogation and then asked if he had roommates. Corbett's response was transcribed as "Uhn-uhn." "No?" said Dunn. Corbett made no audible response.

"I know your mom and dad live locally, right?" asked Dunn. Corbett said, "I guess. I don't know." Dunn asked if Corbett's parents had his guns, and Corbett said he did not know. "You don't know where your guns are?" asked Dunn, and Corbett was silent. Dunn said, "So, you're going to make me go to your mom and dad's house and serve a search warrant on your mom and dad's house, too?" Corbett again was silent, and Dunn asked, "Do you really want that to happen?" Corbett continued to give no response.

Dunn said, "You want me to go there with a pry bar and a battering ram and disrupt your mother and father's life to get your guns?" Corbett protested that he was not going to hurt Bullock. Dunn responded, "But that's not the issue right now. The issue is your guns. I'm gonna get them one way or the other. I—and I really would rather not traumatize your parents in the process." "Are you thinking?" asked Dunn. Corbett was silent.

Dunn told Corbett that his parents knew he was in custody, and Corbett asked how they knew that. Dunn said Corbett's parents were on the news and that his father was asked questions about Corbett. Dunn advised Corbett that if he was trying to protect his parents from knowing what was happening, "that cat's already out of the bag. Would you like to save them some more grief, and let us know where the guns are?" Corbett remained silent.

"Josh? Are you thinking about this? Or are you just ignoring me?" said Dunn. Corbett did not answer, and Dunn told Corbett that it seemed Corbett was ignoring him. Dunn said that he would "make it real simple, so that you understand." Dunn said that he wanted to hear Corbett's side of the story, because he did not "think this needed to be, uh, as big a deal as you're making it out to be." "But, if you're not going to provide me any information, it's gonna get a whole lot worse," he told Corbett.

"Well, what do you want from me?" asked Corbett. Dunn told Corbett he wanted to know why he was at Bullock's house, whether she had been communicating with Corbett, and where his guns were. Corbett denied knowing Bullock and said that his writings were not the product of messages he was hearing or of any actual relationship with her. Corbett disclosed that he took morphine for chronic pain.

Dunn questioned Corbett about why he went to Bullock's house, what he intended to do while there, what he did at the house, how he was able to enter the home, and what he did while in the house. Corbett responded to Dunn's questions.

Dunn told Corbett that he knew Corbett was not a bad person but had made a "one-time mistake," and that he did not want that mistake to be the "end of the world" for Corbett. "But," he continued, "I can't help you unless you help me." Corbett disclosed an address where the guns would be found. "Is that your parents' house?" Dunn asked. Corbett responded that it was his house and he owned it. Corbett described two gun safes and gave Dunn the combinations to the safes and to the room in which they were stored.

At this point, the recording ended.[3] The interrogation continued for what Dunn estimated was an additional ten minutes. During the unrecorded portion of the interrogation, Corbett signed a consent form giving the police permission to search his home for firearms.

The police searched Corbett's home without a warrant on June 9, 2014. Prior to the search, the police were aware that Corbett legally owned eight firearms. They had no information suggesting that he possessed any illegal firearms or ammunition or that he had engaged in any illegal manufacture, modification, or other illegal activity with firearms. During the search, however, they found handguns and rifles, some of which proved to be illegal fully automatic weapons, and what they later described as "a large amount" of ammunition. The items seized during the warrantless June 9 search formed the basis for 24 of the 26 charges filed against Corbett: eight counts of possession of a machine gun (Pen. Code, § 32625, subd. (a)); three counts of possession of an assault weapon (Pen. Code, § 30605, subd. (a)); 10 counts of possession of a destructive device (illegal ammunition) (Pen. Code, § 18710, subd. (a)); two counts of machine gun conversion (Pen. Code, § 32625, subd. (b)); and one count of illegal activity with a .50 BMG rifle (Pen. Code, § 30600, subd. (a).) The only charges not arising from the June 9 search of Corbett's home were one count of first degree burglary of Bullock's house (Pen. Code, § 459) and one count of stalking Bullock (Pen. Code, § 646.9, subd. (a)).

The illegal firearms and ammunition charges form the basis of counts 3 through 26 in the information.

B. The Subsequent Warrant

On June 10, 2014, the police obtained a warrant to search a gun safe that the police had seen during the first search but that Corbett had not told them about, in search of a firearm known to be registered to Corbett but not recovered in the first search, as well as any other firearms located inside the safe. The affidavit submitted in support of the application for a search warrant contained the following relevant facts: (1) details about Corbett's

---

[3] The trial court concluded that Carlozzi inadvertently turned off the concealed recording device and did not do so for the purpose of suppressing evidence.

entry into the victim's home; (2) Corbett had committed stalking, a felony; (3) the firearms registry indicated he owned eight firearms; (4) he had been served with an emergency protective order; (5) in the June 9 interview, Corbett gave "written and verbal consent to search his residence . . . for all firearms and ammunition," and that he provided passcodes and combinations to access those items; (6) during the initial search, the police recovered rifles, handguns, and ammunition; (7) two of the seized rifles proved to be fully automatic weapons in violation of Penal Code section 32625, subdivision (a); (8) all of the guns registered to Corbett except one had been found during the initial search; (9) a third gun safe that had not been mentioned by Corbett was seen by police during the initial search; and (10) the officer believed that the final weapon and other firearms might be in that gun safe. The application did not include any assertion or any facts demonstrating a fair probability that evidence pertaining to the offenses of stalking or burglary would be found at Corbett's residence.

C. Suppression Proceedings

Corbett moved to suppress the statements he made during interrogation and the evidence recovered during the initial search of his home. The People did not oppose the motion to suppress with respect to the statements obtained in violation of his right to remain silent and advised the court that they would not attempt to use Corbett's statements against him in their case in chief.

Ultimately, the trial court suppressed the evidence obtained during the first search. The People petition this court for a writ of mandate compelling the trial court to vacate its order granting the motion to suppress and to issue a new order denying the motion.

## DISCUSSION

### I.    Violations of the Fourth and Fifth Amendments

This case involves violations of both the Fourth and Fifth Amendments. First, the police violated the Fifth Amendment by failing to honor Corbett's unambiguous invocation during custodial interrogation of his right to remain silent. "The Fifth Amendment, which applies to the States by virtue of the

9

Fourteenth Amendment, [citation], provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.' U.S. Const., Amdt. 5. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation. [Citation.] The Court observed that 'incommunicado interrogation' in an 'unfamiliar,' 'police-dominated atmosphere,' [citation], involves psychological pressures 'which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely,' [citation]. Consequently, it reasoned, '[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice.' [Citation.] [¶] To counteract the coercive pressure, *Miranda* announced that police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney. [Citation.] After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease. [Citation.]" (*Maryland v. Schatzer* (2010) 559 U.S. 98, 103-104.)

When a defendant states that he wants to remain silent or that he does not want to talk with the police, "either of these simple, unambiguous statements" constitutes the invocation of the "'right to cut off questioning.' [Citation.]" (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 382.) As the California Supreme Court has explained, "'[I]f at any point in the interview [a defendant] invokes the right to remain silent or the right to counsel, "the interrogation must cease."'" [Citation.]" (*People v. Jackson* (2016) 1 Cal. 5th 269, 339.) A statement obtained in violation of a suspect's *Miranda*[4] rights may not be admitted to establish guilt in a criminal case. (*Ibid.*)

---

[4]      *Miranda v. Arizona, supra*, 384 U.S. 436 (*Miranda*).

There is no dispute that Corbett's Fifth Amendment rights were violated here.[5]  The police ignored his repeated and unambiguous invocations of his right to remain silent and continued to interrogate him.  The People, who bore the burden of establishing by a preponderance of the evidence that Corbett's statements were made voluntarily or that he had waived his *Miranda* rights (*People v. Duff* (2014) 58 Cal.4th 527, 551), conceded that Corbett was subjected to custodial interrogation without waiving his *Miranda* rights; they did not oppose Corbett's motion to suppress with respect to his statements.

The police also violated the Fourth Amendment, which guarantees the right of citizens to be free from unreasonable governmental searches and seizures.  (U.S. Const., 4th Amend.; see also *Terry v. Ohio* (1968) 392 U.S. 1, 8-9.)  While the "Fourth Amendment protects the individual's privacy in a variety of settings," in none of these settings "is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms:  'The right of the people to be secure in their . . . houses . . . shall not be violated.'" (*Payton v. New York* (1980) 445 U.S. 573, 589 (*Payton*).)  Accordingly, "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." (*Id.* at p. 586; see also *Michigan v. Fisher* (2009) 558 U.S. 45, 47 (*Fisher*).)

Here, it is undisputed that the police seized firearms and ammunition from Corbett's home during a warrantless search of the home.  This search was presumptively unreasonable. (*Payton*, *supra*, 445 U.S. at p. 586; *Fisher*, *supra*, 558 U.S. at p. 47.)  To avoid suppression of the evidence, the People unsuccessfully sought to demonstrate that Corbett had voluntarily consented to the search of his residence.  The trial court found that Corbett did not voluntarily consent to the search of his home, explaining that it found that "the officers overcame the defendant's willingness to resist and that he did not meaningfully consent."  The court observed that Corbett "kept asserting

---

[5]     Upon reviewing the transcript of the interrogation approximately one year later, Carlozzi wrote to the prosecutor handling the case, "Doesn't look good.  I honestly hope this can be settled without a trial."

11

his rights and they just kept on talking to him. And my feeling was at some point this man, in those conditions, on that date, probably didn't think too much of his constitutional rights anymore, since the ones that had been presented to him—I won't say they're trampled, that's overly dramatic, but they weren't doing much to slow things down. And his physical state and various special circumstances about him all contributed to the fact that by the time he put his name and signature on that page, that did not mean much." "It wasn't close, frankly, to being a consent," said the trial court. As there was no contention that any other exception to the warrant requirement applied here, the evidence was seized in violation of the Fourth Amendment.

## II.    The People Have Not Established Inevitable Discovery

Because Corbett's statements to the police were conceded to be inadmissible as a result of the Fifth Amendment violations, the only issue that remained for the trial court to resolve, and that is presented to this court to review, concerns the suppression of the evidence obtained in violation of the Fourth Amendment in the warrantless search of Corbett's home. "The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and of testimony concerning knowledge acquired during an unlawful search, *Silverman v. United States*, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)." (*Murray v. U.S.* (1988) 487 U.S. 533, 536 (*Murray*).) It "applies not only to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence." (*Nix v. Williams* (1984) 467 U.S. 431, 441 (*Nix*).)

The Supreme Court has long held that evidence does not automatically become "sacred and inaccessible" in the event of a constitutional violation. (*Silverthorne Lumber Co. v. United States* (1920) 251 U.S. 385, 392, overruled on other grounds in *United States v. Havens* (1980) 446 U.S. 620; see also *Nix, supra*, 467 U.S. at p. 441.) The Supreme Court has observed, "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has

been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" (*Wong Sun v. United States* (1963) 371 U.S. 471, 487-488 (*Wong Sun*); see also *Nix*, at pp. 441-442.) Therefore, if knowledge of the facts in question "is gained from an independent source, they may be proved like any others . . . ." (*Silverthorne*, at p. 392.)  This independent source doctrine, which has been applied to evidence acquired not only through Fourth Amendment violations but also through Fifth and Sixth Amendment violations, balances the competing policy interests of deterring unlawful police conduct and providing to juries all probative evidence of a crime by placing the police in the same, not a worse, position than they would have been in if the unlawful police conduct had not occurred.  (*Murray*, *supra*, 487 U.S. at p. 537; *Nix*, at p. 443.)

The inevitable discovery doctrine, recognized by the Supreme Court in *Nix*, *supra*, 467 U.S. 431, is "closely related" to the independent source doctrine.  (*Id*. at p. 443.)  It is "in reality an extrapolation from the independent source doctrine:  *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." (*Murray*, *supra*, 487 U.S. at p. 539.)  The Supreme Court has described the test as follows:  "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . the evidence should be received."  (*Nix*, at p. 444.)  The prosecution must establish inevitable discovery without resort to speculation, for "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." (*Id*. at p. 444, fn. 5.)

In *Nix*, the Supreme Court held that the inevitable discovery doctrine permitted the introduction of evidence about the discovery and condition of a murder victim's body that had been obtained through interrogation in violation of his right to counsel because "the evidence in question would inevitably have been discovered without reference to the police error or misconduct." (*Nix, supra*, 467 U.S. at p. 448.)  Although Nix's incriminating statements could not be introduced against him at trial (*id*. at p. 437), the Supreme Court ruled that evidence of the location and condition of the body

13

was admissible under the inevitable discovery doctrine because until Nix led the police to the body, a 200-volunteer search party was methodically canvassing two counties, looking specifically on roads, in ditches, and in culverts, and was only two and one-half miles away from her body and three to five hours of searching from reaching the culvert where the body was found. (*Id*. at pp. 448-450.) The search was suspended only because Nix led the police to the body's location. (*Id*. at p. 449.) Based on the detailed historical facts presented about the method and progress of the search, the Supreme Court could say that the record was "clear that the search parties were approaching the actual location of the body, and we are satisfied, along with three courts earlier, that the volunteer search teams would have resumed the search had Williams not earlier led the police to the body and the body inevitably would have been found." (*Id*. at pp. 449-450.)

This is not a case like *Nix*, *supra*, 467 U.S. 431, in which the use of legitimate investigatory tactics had brought police to the brink of discovering the illegally obtained evidence when the misconduct occurred, such that the Supreme Court could say the evidence would inevitably been discovered in the absence of that misconduct. Assuming for the sake of this portion of the discussion that the People had probable cause to seize Corbett's firearms, the People did not present evidence demonstrating that the police had or would have developed probable cause to suspect that firearms were located at his home address if no constitutional violation had occurred. The record establishes that the police knew that Corbett was the registered owner of multiple firearms and that they were aware of two different gun-related permits he had obtained, but the People presented no evidence that aside from the information obtained unconstitutionally law enforcement had any information concerning Corbett's residence or any factual basis to suspect that the firearms registered to him would be found in his home or at any particular location. Indeed, it is clear from the transcript of the interrogation that the officers made no effort to determine where Corbett lived, that they were unaware that he lived in his own home, and that they did not have any information as to where the firearms were stored. The People conceded that the police lacked knowledge that Corbett had his own residence prior to the interrogation. Although two police officers testified at the suppression

14

hearing, neither articulated any basis distinct from the interrogation for believing that firearms would be found in Corbett's home or any method by which they sought to locate his address and none of the documentary evidence provided to this court includes any information about Corbett's residence or the potential location of the firearms.[6]

Moreover, the People did not present evidence that law enforcement was engaged in any lines of investigation that would ultimately have led them to the illegal firearms in Corbett's home without the information gleaned through the "overreaching by the police" (*Nix, supra,* 467 U.S. at p. 447) in the interrogation and search. Instead, the evidence demonstrates that the police obtained all their information about where the firearms registered to Corbett could be found and what to seize from Corbett's home from the violations of his Fourth and Fifth Amendment rights. Indeed, when the police sought a search warrant on June 10 they relied heavily on Corbett's purported consent and the items seen during the initial, illegal

---

[6] We are aware that the trial court was not troubled by the absence of information as to where the weapons would be found prior to the interrogation. The court opined that before the interrogation the police "had probable cause to get a warrant to go seek weapons, once they knew where they were likely to be found," and that although the court did not know "what they would have started with for the first address" "they could have gotten a warrant to get started." The court thought that this "may very well have led to the arrival at some location and finding out the defendant didn't reside there anymore. And I believe the detectives would have continued to pursue that information until they found the correct address, and got a new warrant and went to the correct address." Probable cause is not established, however, until the police demonstrate that there is a fair probability that contraband or evidence of a crime will be found in a particular place. (*Illinois v. Gates* (1983) 462 U.S. 213, 238 (*Gates*); *People v. Scott* (2011) 52 Cal.4th 452, 483 (*Scott*) ["Probable cause sufficient for issuance of a warrant requires a showing in the supporting affidavit that makes it substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought"].) The fact that the police still needed to know "where they [the firearms] were likely to be found" makes clear that the police lacked information demonstrating that there was a fair probability that Corbett's firearms were located in any particular place before they interrogated him.

search, and they made no effort to establish probable cause in the warrant application based on information gathered from sources other than Corbett's statements to the police and the warrantless search of his home.  Because the People did not present "historical facts capable of ready verification or impeachment" establishing that the evidence obtained in the June 9 search would inevitably have been discovered without reference to the police error or misconduct (*id.* at pp. 444, fn. 5, 448), they failed to meet their burden of showing by a preponderance of the evidence that the evidence obtained in the illegal search of Corbett's home would inevitably have been discovered even if no violation of any constitutional provision had taken place.  (*Id.* at p. 444.)

Finally, the Ninth Circuit Court of Appeals has held that the inevitable discovery doctrine does not apply when officers have probable cause to apply for a warrant but fail to do so. (*United States v. Lundin* (9th Cir. 2016) 817 F.3d 1151 (*Lundin*); *United States v. Mejia* (9th Cir. 1995) 69 F.3d 309, 320; *United States v. Echegoyen* (9th Cir. 1986) 799 F.2d 1271, 1280, fn. 7.)  The Court of Appeals has explained, "This court has never applied the inevitable discovery exception so as to excuse the failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant.  As we stated in *Echegoyen*, to 'excuse the failure to obtain a warrant merely because the officers had probable cause and could have obtained a warrant would completely obviate the warrant requirement.'  799 F.2d at 1280 n. 7; see also *United States v. Johnson*, 22 F.3d 674, 683 (6th Cir.1994) ('to hold that simply because the police could have obtained a warrant, it was therefore inevitable that they would have done so would mean that there is inevitable discovery and no warrant requirement whenever there is probable cause').  If evidence were admitted notwithstanding the officers' unexcused failure to obtain a warrant, simply because probable cause existed, then there would never be *any* reason for officers to seek a warrant.  To apply the inevitable discovery doctrine whenever the police could have obtained a warrant but chose not to would in effect eliminate the warrant requirement.  [¶]  We are neither free nor willing to read the warrant requirement out of the Constitution.  Accordingly, even if we assume that the detectives were in possession of competent evidence showing probable cause at the time of the search, the inevitable discovery

16

doctrine would not justify introduction of the evidence seized without a warrant." (*Mejia*, at p. 320.)

The trial court put the rule succinctly: "[T]he courts are saying . . . that when you have the choice, [to] go get a warrant or not, don't rely on the fact that I could have gotten one as your reason for not getting one." The court explained, "Yes, they could have gotten a warrant. But when they don't, can they do that with no risk at all? Can they—can I protect the Fourth Amendment if I tell them don't worry about it, if you're confident you could have gotten a warrant, just go right ahead and do what you think is necessary and somebody, after the fact, will sort through all this and piece together probable cause and say, sure, it would have been nice to get a warrant, and you could [] have gotten one, but it was okay that you went through the door. [¶] I just—you know, I don't think that's Fourth Amendment law. And I hope it's not Fourth Amendment law."

The People attempt to distinguish *Lundin*, *supra*, 817 F.3d 1151, on which the trial court relied, on the ground that the police here later sought a warrant to search the house again. The later warrant does not change the analysis. *Lundin* and similar cases concern the choice made by law enforcement to conduct a warrantless search despite having probable cause to obtain a search warrant, and they stand for the principle that the fact that a warrant could have been obtained does not excuse the failure to obtain it. Here, the parties agreed in the trial court that at the time Corbett's house was searched, the police had probable cause to obtain a warrant to search the home, and for purposes of this portion of the discussion we accept this contention. They chose not to do so, electing instead to rely on the consent form to establish the constitutionality of their warrantless search. The later choice to seek a search warrant when the police subsequently decided they wished to return to Corbett's house to search for one item they did not find during the illegal search and to seize one item that they had seen during the first search does not alter or legitimize the earlier decision to bypass the warrant requirement and rely upon an improperly obtained consent form to perform the search. In both instances, "allowing the government to claim admissibility under the inevitable discovery doctrine when officers have probable cause to obtain a warrant but fail to do so would encourage officers

17

never to bother to obtain a warrant." (*Lundin*, at p. 1162.) As the trial court put it, the police obtained evidence by violating the Fourth Amendment, and the People were asking the court, "if we will honor the Fourth Amendment eventually, [to] give us credit for that. We'd like to do double Fourth Amendment on our next search, will that count for the fact we violated [it] on our first search[?] And I think the answers to those things—not trying to derogate your argument—is clearly no, the first search has to be valid."[7]

---

[7]    As part of this argument, the People rely on *Murray*, *supra*, 487 U.S. 533, and *People v. Weiss* (1999) 20 Cal.4th 1073, for the principle that evidence from an initial illegal entry may nonetheless be admissible if a warrant is later legally obtained to search the premises. Both of these decisions concern the independent source exception to the exclusionary rule rather than inevitable discovery. *Murray* involved the police making a warrantless entry into a warehouse and observing bales that were believed to contain drugs. (*Murray*, at p. 535.) The police did not touch the bales, but left and obtained a warrant based on an application that did not mention the prior entry or include recitations of what the officers had observed during the entry. (*Id.* at pp. 535-536.) The question in *Murray* was "whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here," and the Supreme Court observed that the second search would not have been independent "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." (*Id.* at p. 542, fn. omitted.) The facts here are significantly different than those in *Murray*: the officers performed a full search and seized items from Corbett's home and then sought a warrant based primarily on the information about the prior search and the officers' observations during that search. *Weiss* is the California Supreme Court's analysis of the *Murray* decision and considers whether *Murray* requires the court to make a finding that the police subjectively would have sought a warrant even without the illegal conduct in the case. (*Weiss*, at p. 1079.) The California Supreme Court answered that question in the negative: "*Murray* did not change the long-standing rule that the reviewing court must excise all tainted information [from the warrant application] but then must uphold the warrant if the remaining information establishes probable cause." (*Id.* at p. 1081.) Neither of these independent source exception decisions tends to suggest that the search warrant obtained here could validate the prior search because, as

18

The People argue that the trial court's reliance on *Lundin*, *supra*, 817 F.3d 1151, was "improper, given the weight of contrary, controlling authority." The People have not provided any contrary controlling authority, nor have they demonstrated that the Ninth Circuit Court of Appeals' longstanding interpretation of the inevitable discovery doctrine conflicts with the decisions of the United States Supreme Court. In any event, whether we analyze this matter through the framework of *Nix* or *Lundin*, the outcome is the same: the trial court properly suppressed the evidence seized during the warrantless search of Corbett's home.

### III. Impact of June 10 Warrant on the Inevitable Discovery Analysis

The People argue that the evidence seized from Corbett's home in the initial search on June 9 should not have been suppressed because the police obtained a warrant to search the home the following day, June 10. They contend that the search warrant issued on June 10 was validly issued based upon independent probable cause, and argue that because the valid, judicially authorized June 10 search warrant granted the police authority to enter Corbett's home to search for and seize weapons, the fact of the issuance of the warrant made it inevitable that law enforcement would have lawfully obtained the firearms and ammunition that had been seized the day before during the warrantless search of the home. Under this theory, the trial court erroneously suppressed the evidence seized in the warrantless search of June 9 because the police obtained a warrant to return to the home on June 10.

As the People acknowledged at oral argument, their inevitable discovery doctrine argument hinges on the June 10 warrant being "validly issued based upon independent probable cause." The People argue that the facts known to the police before they interviewed Corbett—the circumstances of his offense and arrest, the records indicating that he was the registered owner of eight firearms, and the fact that he had been served with an emergency protective order that prohibited firearm ownership and

---

will be discussed in more detail *infra*, the People have not demonstrated that the warrant application, after excising information obtained in violation of Corbett's constitutional rights, established independent probable cause.

possession—combined with their asserted entitlement to a search warrant under Penal Code section 1524, subdivision (a)(11) because of the emergency restraining order—are all facts that are "independent of—and not derived from—the intervening unlawful entry into Defendant's residence." Accordingly, the People conclude, "the search warrant was validly issued upon independent evidence that is unaffected by the prior unlawful entry into Defendant's residence," making it inevitable that the items illegally seized the day before would have been seized eventually. This contention is without merit.

Family Code section 6389 makes it illegal for a person subject to a protective order such as that here to own, possess, purchase, or receive a firearm or ammunition while the protective order is in effect. (Fam. Code, § 6389, subd. (a).) Accordingly, firearms that are within the possession or control of the restrained person must be relinquished: "upon issuance of a protective order, as defined in Section 6218, the court shall order the respondent to relinquish any firearm in the respondent's immediate possession or control or subject to the respondent's immediate possession or control." (Fam. Code, § 6389, subd. (c)(1).) The statute establishes specific procedures for firearms surrender. The relinquishment process "shall occur by immediately surrendering the firearm in a safe manner, upon request of any law enforcement officer, to the control of the officer, after being served with the protective order." (Fam. Code, § 6389, subd. (c)(2).) "Alternatively," the statute continues, if there is no request for relinquishment, "the relinquishment shall occur within 24 hours of being served with the order, by either surrendering the firearm in a safe manner to the control of local law enforcement officials, or by selling the firearm to a licensed gun dealer." (*Ibid*.) Within 48 hours of service of the order, the restrained person must file a receipt with the court that issued the order and the law enforcement agency that served it showing that the firearm was surrendered to law enforcement or sold to a licensed gun dealer.[8] (*Ibid*.)

---

[8] These provisions contemplate a firearms owner with firearms in or subject to his immediate possession or control—not the case with a defendant in custody. Other provisions of Family Code section 6389 further establish that the relinquishment provisions of the statute are aimed at firearms that

Penal Code section 1524, subdivision (a)(11) authorizes the issuance of a search warrant "[w]hen the property or things to be seized include a firearm that is owned by, or in the possession of, or in the custody or control of, a person who is subject to the prohibitions regarding firearms pursuant to Section 6389 of the Family Code, if a prohibited firearm is possessed, owned, in the custody of, or controlled by a person against whom a protective order has been issued pursuant to Section 6218 of the Family Code, the person has been lawfully served with that order, and the person has failed to relinquish the firearm as required by law."

A. Basis for the Search Warrant

Although the People argue that the police were entitled to a search warrant under Penal Code section 1524, subdivision (a)(11) because of Corbett's purported failure to comply with his firearms relinquishment obligations after being served with the emergency protective order, the record demonstrates that the search warrant was not sought on this basis. The affidavit submitted in support of the search warrant application mentioned that he had been served with a protective order but did not assert that Corbett had refused or failed to comply with his obligations pursuant to the protective order. Instead the People relied upon Corbett's purported consent to search and the items that the police had discovered during the prior day's search as the basis for the request to return to the home.

The affidavit submitted in support of the application for a search warrant contained evidence that: (1) Corbett entered the victim's home (with a description of the incident and the celebrity status of the victim); (2) Corbett committed stalking, a felony; (3) the firearms registry indicated

_____

are within the possession or control of the restrained person. Family Code section 6389, subdivision (g) provides that "The restraining order requiring a person to relinquish a firearm pursuant to subdivision (c) shall prohibit the person from possessing or controlling any firearm for the duration of the order." Also, if the restrained person "owns a firearm that is not in his or her immediate possession," upon notice of that fact the court may limit the restraining order to exclude that firearm if the judge is satisfied the respondent is unable to gain access to that firearm while the protective order is in effect. (Fam. Code, § 6389, subd. (*l*).)

he owned eight firearms; and (4) he had been served with an emergency protective order.  The search warrant affidavit did not describe any requirement that Corbett surrender his firearms or any alleged failure to do so.  In fact, all the remaining material facts asserted in the affidavit concerned the information obtained during the interrogation and the warrantless search:  the officer swore that in the June 9 interview, Corbett gave "written and verbal consent to search his residence . . .  for all firearms and ammunition," and that he provided the relevant passcodes and combinations to access those items.  The officer described the recovery of rifles, handguns and ammunition from the home and the determination that two of the seized weapons were fully automatic weapons, possession of which was a felony pursuant to Penal Code section 32625, subdivision (a).  The officer then attested that all of the guns registered to Corbett except for one had been found during the initial search, and that a third gun safe that had not been mentioned by Corbett was located during that search.  The officer stated his belief that the final weapon and other firearms might be in the gun safe and requested a warrant to search the safe for the final firearm and any others inside.

### B. Emergency Protective Order

Even if the police had sought the search warrant on the basis of Corbett's purported violation of the emergency protective order, the People have not established that a search warrant could properly have been issued on this basis due to problems of notice and the absence of an opportunity to comply with the protective order's firearms relinquishment obligations.

#### 1. Notice

For a search warrant to be issued pursuant to Penal Code section 1524, subdivision (a)(11), the emergency protective order must be "lawfully served" on the restrained person.  (Pen. Code, § 1524, subd. (a)(11).)  While Corbett was undisputedly served with an emergency protective order while in custody, the order served upon him failed to give him notice of any firearms relinquishment obligations as required by Family Code section 6389.

Family Code section 6389, subdivision (f) provides that "[t]he restraining order requiring a person to relinquish a firearm pursuant to

22

subdivision (c) shall state on its face that the respondent is prohibited from owning, possessing, purchasing, or receiving a firearm while the protective order is in effect and that the firearm shall be relinquished to the local law enforcement agency for that jurisdiction or sold to a licensed gun dealer, and that proof of surrender of sale shall be filed with the court within a specified period of receipt of the order.  The order shall also state on its face the expiration date for relinquishment." (Fam. Code, § 6389, subd. (f).)  The emergency protective order included in the record contains no relinquishment language.  The document the People have identified to this court as giving Corbett notice of the firearm restrictions—Exhibit B to the Motion to Suppress—contains no mention of firearms at all, let alone an order that Corbett relinquish or not possess firearms.[9]

Family Code section 6389 also requires that "all forms providing notice that a protective order has been requested or granted" include "a notice that,

---

[9]     Although the People chose to rely only on the first page of the emergency protective order when they supported their contentions by referring this court only to that page (Cal. Rules of Court, rule 8.204(a)(1)(C) [briefs must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears]), we are aware from our review that the record includes an exemplar of the second page of a 2007 form for protective orders.  On that second page, a full page of text in fine print that is headed by the caption "WARNINGS AND INFORMATION" is a statement that "PERSONS SUBJECT TO A RESTRAINING ORDER ARE PROHIBITED FROM OWNING, POSSESSING, PURCHASING, RECEIVING, OR ATTEMPTING TO PURCHASE OR RECEIVE A FIREARM (PENAL CODE SECTION 12021(g))."  Penal Code section 12021, however, was repealed in 2012.  (Stats. 2010, ch. 711, § 4.)  Therefore, assuming that the blank copy of the emergency protective order form in the record corresponds to the emergency protective order served on Corbett, Corbett was given a protective order that failed to mention firearms in the orders section of the document; did not refer to relinquishment or surrender of firearms anywhere in the document; and in the only place where firearms were mentioned, on the second page amongst the other information about the protective order, it directed him to a repealed statute for further information on his obligations with respect to firearms.

23

upon service of the order, the respondent shall be ordered to relinquish possession or control of any firearms and not to purchase or attempt to purchase or receive any firearms for a person not to exceed the duration of the restraining order." (Fam. Code, § 6389, subd. (b).) Such a form existed at the time of Corbett's arrest, but it was not used by the police. Instead, the police used an outdated Judicial Council form that did not contain any firearm relinquishment language.[10]

The People assert that the emergency protective order served on Corbett provided actual notice that he "could not possess or own a firearm." The People have failed to prove this contention. The emergency protective order identified to this court by the People as the source of notice of the firearm restrictions, Exhibit B to the Motion to Suppress, contains no

---

[10] The 2007 form used here was determined by advisory committees of the Judicial Council to be "somewhat difficult to understand because of its layout." (Judicial Council Invitation to Comment SPR12-26.) In 2012, the Family and Juvenile Law Advisory Committee and the Civil and Small Claims Advisory Committee of the Judicial Council recommended revision of the 2007 form to "highlight the restrictions on firearms and ammunition in the order and to clarify whether firearms have been reported, observed, searched for, or seized in connection with an incident." (Judicial Council Invitation to Comment SPR12-26.) The proposed new form was designed to "provid[e] directly in the order that the restrained person is prohibited from owning, possessing, purchasing or receiving firearms or ammunition." (Judicial Council Invitation to Comment SPR12-26.) "Placing the firearms restrictions directly in the order on page 1, instead of just in the information on the reverse side of the form, will give greater force and prominence to the firearms prohibition," concluded the committees. (Judicial Council Invitation to Comment SPR12-26.) The new form was adopted for mandatory use with a revision date of January 1, 2014. Had the police used this form, the protective order served on Corbett would have provided in the orders section of the form—immediately after orders concerning harassment, contact, and staying away from the protected person—this language: "YOU MUST NOT own, possess, purchase, receive, or attempt to purchase or receive any firearm or ammunition. If you have any firearms, you must turn them in to a law enforcement agency or sell them to, or store them with, a licensed gun dealer."

24

prohibition on owning firearms, and, indeed, no reference to firearms at all. The People say that the order "cited Family Code sections 6200 et seq. on the face of the document," but they are referring to a tiny line in the footer of the form, and they have not shown that while in police custody Corbett had access to the legal resources that would have permitted him to obtain actual notice of his obligations from this minuscule mention of a statute. Rodriguez, the officer who served the order, testified generally at the suppression hearing that he "explained what it says on the front and the back" when he served to Corbett, but the People did not elicit any specific testimony to establish that Corbett was advised of firearm restrictions at that time. The People have failed to demonstrate that Corbett was given notice of his obligations under Family Code section 6389.[11]

### 2. Opportunity to Comply

The People also have not shown that Corbett was given any opportunity to relinquish his firearms or arrange for their surrender before the police searched his home. It is undisputed that Corbett was in custody from the time of his arrest through the time that his home was searched. The only way the police would permit Corbett to comply with their understanding of Family Code section 6389 was to consent to a warrantless search of his home. No other avenue for compliance was available to Corbett because the police held him in custody without the ability to make a telephone call to arrange for relinquishment of the firearms, all of which were outside his immediate custody or control, to the police or to a licensed gun dealer. (Indeed, the People have not demonstrated that Corbett was ever informed that the law provided that as an alternative to surrendering his firearms to the police he could arrange for their conveyance to a licensed gun dealer.) The People do not explain how Corbett could have "failed to relinquish [his] firearm[s] as provided by law" (Pen. Code, § 1524, subd. (a)(11)) without any opportunity to comply with the statute.

---

[11]     We emphasize, however, that the use of an outdated form for an emergency protective order does not in any way relieve the subject of the order of the obligation to comply with those portions of the order as to which adequate notice has been given.

The People's view of this statute would permit the police essentially to convert an emergency protective order—which requires only a showing of good cause, not probable cause (Fam. Code, § 6320)—to a search warrant just by holding the restrained person in custody for 24 hours. The trial court recognized this problem, expressing concern that "the net result is that here's the protective order, by the way, [your time to comply has] already expired, we get to have your guns if we want them." Moreover, because it is a criminal offense to own a firearm while a protective order is in effect (Fam. Code, § 6389, subd. (a)), this interpretation of the law would also permit law enforcement to cause a restrained person to become criminally liable for a violation of the statute just by keeping him or her in custody until the expiration of the time frame provided in the statute. As the trial court pointed out, this raises the issue of "what happens when we issue protective orders that make people criminals because they haven't turned over things that they couldn't turn over because they're in police custody." Neither of these consequences would afford due process.

The People's interpretation of the statutory scheme also would create equal protection dilemmas, because restrained persons with financial means could protect their Fourth Amendment rights by posting bail and complying with the relinquishment statute while indigent defendants would be forced to waive their Fourth Amendment rights or to have their refusal to waive their rights afford the basis for a search warrant and for criminal liability. As the trial court recognized, "[I]f a very wealthy person were subject to an [emergency protective order] and could immediately post bail, that . . . person could then go and surrender his weapons and not have his home tromped into by someone searching. Whereas someone who is living in a tent in skid row of Los Angeles is going to be in jail for the 24 hours [after the protective order is served], and wherever their weapons might be found they're not going to be able to stop it." In light of the absence of actual notice of his obligations under Family Code section 6389 or any opportunity to comply with the law, the People have not demonstrated that Penal Code section 1524, subdivision (a)(11) offered a basis for obtaining a search warrant for Corbett's home.

26

## C. Purported Refusal to Surrender Firearms

The People attempt to avoid the problems of notice and opportunity to comply by asserting that Corbett refused to surrender his firearms when asked to do so during the interrogation. The People have not provided any citation to the record to support this assertion, in violation of California Rules of Court, rule 8.204(a)(1)(C), and the record contains contrary evidence: at the suppression hearing the prosecutor asked Dunn, "Did the defendant, during the conversation, ever decline to turn over his weapons to you?" Dunn responded, "No."

We have reviewed the transcribed portion of the interrogation and have not located any refusal to surrender weapons upon police request. Dunn did tell Corbett that with the emergency protective order "comes with firearm restrictions" and that they were "gonna have to hold on to those guns until this thing gets resolved." Dunn, however, did not ask Corbett to turn his firearms in to the police or to arrange to sell them to or store them with a licensed gun dealer. Instead, Dunn gave Corbett a choice: he could either consent to a search of wherever the guns were located ("we can either go there with your permission and voluntarily, you know, surrender the guns"), or the police would "have to write a search warrant, in which case we'll have to go into your house or your apartment and search the entire location until we find the weapons that we know you have."

For his part, Corbett never stated that he refused to relinquish his firearms. He simply invoked his right to remain silent repeatedly and told the police, "You guys do what you have to do. I don't know what to tell you." When Dunn returned to questioning Corbett about the location of the firearms and told Corbett again that he could give permission for the search of his home or Dunn would "have to write a search warrant and I'll go there with a team and do what we got to do to find them," Corbett asked if he could make a telephone call because he had not been given a call yet. Dunn refused to provide Corbett with his requested telephone call until after the interrogation. Dunn did not explore whether Corbett wanted to arrange for the relinquishment, sale, or proper storage of his weapons, nor did he give Corbett the means to make such arrangements to comply with his firearm

27

obligations, suggesting an objective of gaining access to Corbett's home rather than the surrender of firearms.

As the record does not support the People's contention that Corbett refused to relinquish his firearms, the People have not established on this record that Corbett can be considered to have "failed to relinquish his firearm as provided by law" as required to obtain a search warrant under section 1524, subdivision (a)(11).

D. Analysis of Redacted Warrant Application

When the affidavit supporting a search warrant contains information derived from unlawful conduct as well as other, untainted, information, "the reviewing court must excise all tainted information but then must uphold the warrant if the remaining information establishes probable cause." (*People v. Weiss, supra*, 20 Cal.4th at p. 1081;  see also *Franks v. Delaware* (1978) 438 U.S. 154 (*Franks*).)

The People asserted at oral argument that the trial court found that after excising illegally obtained evidence from the warrant application the warrant was nonetheless issued on probable cause.  From our review of the extensive transcripts in the case it appears that the People requested that the court make such a finding, but that the court declined the request to excise the tainted information from the warrant application and to perform a *Franks* analysis based on the untainted information known to the officers prior to the interrogation, describing it as a "parallel, but not controlling, kind of analysis" that could not overcome the policy against encouraging the police to neglect the constitutional requirement of a warrant.  The court was very clear that it believed there had been probable cause that would have allowed the police to obtain a warrant, but we have not found any review by the trial court of the warrant application to determine whether it set forth facts establishing independent probable cause, nor have the People identified such an analysis in the record.

Removing from the affidavit the information that the police obtained improperly during the initial search, the warrant application does not contain facts sufficient to establish independent probable cause to search Corbett's home on June 10.  The police did not identify any evidence of stalking or

burglary that they had reason to believe would be in Corbett's home, and the affidavit contained no facts from which it could be concluded that there was a fair probability that evidence of stalking or burglary, or contraband relating to those crimes, would be found at the residence. (See *Gates*, *supra*, 462 U.S. at p. 238; *Scott*, *supra*, 52 Cal.4th 483.) The only evidence in the affidavit demonstrating that there was a fair probability that contraband or evidence of any crime would be found at Corbett's residence on June 10 was the fact that the police had discovered during the warrantless search on June 9 that Corbett possessed illegal automatic weapons and ammunition. That is, the police relied on the fruits of their illegal search to justify their request for a warrant authorizing them to conduct another search and to seize the gun safe they had seen during the first search. This is not independent probable cause—it is probable cause that resulted directly from, and was dependent on, information derived from the illegal search. Therefore, the facts provided in the search warrant application to establish probable cause were obtained "by exploitation of th[e] illegality" of the earlier warrantless search, and not "by means sufficiently distinguishable to be purged of the primary taint" of the illegal police conduct. (*Wong Sun*, *supra*, 371 U.S. at p. 488; see also *U.S. v. Boatwright* (9th Cir. 1987) 822 F.2d 862, 864-865 [the inevitable discovery doctrine "requires that the fact or likelihood that makes the discovery inevitable arise from circumstances other than those disclosed by the illegal search itself"].) Accordingly, the People have not demonstrated that the search warrant was issued based on independent probable cause, and they have not established any error in the trial court's ruling that the evidence obtained in the warrantless June 9 search of Corbett's home must be suppressed.

## DISPOSITION

The writ petition is denied.


ZELON, Acting P. J.


29

We concur:

SEGAL, J.

KEENY, J.*

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.