Filed 9/7/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LEROY WALLACE III,<br><br>    Defendant and Appellant. | A149049<br><br>(Solano County<br>Super. Ct. No. FCR313484) |

Defendant Leroy Wallace III seeks reversal of the judgment against him for possession of a baton or similar weapon in violation of Penal Code section 22210,[1] which the court entered after a negotiated disposition of his case. Officer Ambrose of the Fairfield Police Department found the baton in defendant's vehicle after defendant was stopped by another officer for a traffic violation and then arrested at the scene by Ambrose as a suspect in a domestic violence incident. Defendant contends the trial court erred when it denied his motion to suppress evidence relating to the baton on the ground that it was obtained during an inventory search of his vehicle. The People do not defend the search as a valid inventory search or otherwise contend it was constitutionally permissible. Rather, they assert that we should affirm the judgment because police inevitably would have discovered the baton in the course of impounding the vehicle and taking an inventory of its contents. We conclude there is no substantial evidence either that the evidence was obtained as the result of a valid inventory search or that the baton inevitably would have been discovered. Therefore, we reverse the judgment.

---

[1] All statutory references are to the Penal Code.

1

# BACKGROUND

In March 2015, the Solano County District Attorney filed an information charging defendant with possession of a baton in violation of section 22210, which prohibits possession of "any instrument or weapon of the kind commonly known as a billy, blackjack, sandbag, sandclub, sap, or slingshot." In June 2015, defendant moved under section 1538.5 to suppress evidence of the baton and other evidence relating to it. In November 2015, the court, a magistrate presiding, held a preliminary hearing at which the court also considered defendant's motion.

At the hearing, the officer who arrested defendant, Michael Ambrose of the Fairfield Police Department, was the only person who testified. Officer Ambrose said that at 9:47 a.m. on March 18, 2015, he heard defendant's name broadcast over the police radio as someone stopped by another officer, Sergeant Reeves, in Fairfield for having "false tabs" on his vehicle. Ambrose knew defendant was wanted for a domestic violence incident that had occurred a night or two before. Ambrose went to the traffic stop and spoke to Reeves by Reeves's own vehicle. The two then went up to defendant's vehicle, removed defendant from the vehicle, placed him in handcuffs and searched his person. Asked what happened next, Ambrose said, "I then put [defendant] in the back of my vehicle, and went back and searched his vehicle."

In response to the prosecutor's further questioning, Ambrose testified no one else was in defendant's vehicle and no one was in the area to take custody of defendant's vehicle. He further testified that the Fairfield Police Department had a policy that required officers to have a vehicle towed and inventoried when no one was present to take custody of it. Asked if this was the situation in defendant's case, Ambrose replied, "In this case, the subject also had no license, . . . and Sergeant Reeves was citing him for that as well. So there was [*sic*] a couple of different reasons to get in and search his vehicle: One being inventory search, and one being incident to the arrest that I was making."

Ambrose also testified that the purpose of the department's inventory search policy was "to ensure if there is [*sic*] any items of high value in the vehicle, that we are to

2

note them—or, actually, take and put them into our custody for safekeeping, just so that when the vehicle is towed, it's not going to possibly become missing. [¶] Or the defendant or the person who the vehicle is being towed is not going to be able to come back and say, 'I had $1,000,000 in the trunk, and it's missing now, so, therefore, the Fairfield Police Department owes me money.' "

Ambrose then said he searched defendant's vehicle after placing defendant in the back of the patrol car: "I went up to the vehicle. I started on the open driver's side door that was still open from when I removed him. I started to go into the vehicle, and as I did, I noticed a red handle sticking up between the center console and the driver's seat. [¶] I reached down and pulled out, from grabbing the handle that was exposed, about a 24-inch long brown wooden baton with red tape on the end where the handle would be." He saw the red handle of the baton when he "actually entered the vehicle." Ambrose did not see any non-violent purpose for the baton, particularly in light of the red tape handgrip that prevented the baton from slipping when swung. He considered the baton to be a deadly weapon based on his training and experience, and its presence in the vehicle was an additional basis for his arrest of defendant. After finding the baton, Ambrose said, he continued to search the vehicle. He did not locate anything of value.

Ambrose further testified that he was not sure if defendant's vehicle was towed or not because he left with defendant while Reeves stayed behind with the vehicle. Ambrose said it was standard procedure to fill out a "California Highway Patrol 180 Form" (CHP 180 form) if a vehicle was towed, and acknowledged that the form contained a field in which one could inventory the items that were found in the towed vehicle. However, he said, he had nothing to do with the traffic stop or anything to do with filling out such a form, if one was filled out. He also testified that he did not note in his own police report what kind of vehicle defendant was driving because "[t]he vehicle had nothing to do with why I was there."

After hearing argument, the court denied defendant's suppression motion. It stated about Ambrose's search of defendant's vehicle, "This was not a search incident to an arrest; it was a search that [was] based upon the normal practice to once this individual

3

was taken into custody on the serious charge of the violation of domestic violence, to inventory his car and his car be[ing] towed.

"Officer Ambrose was arresting him for the circumstances that he discovered once the object was seen, and it wasn't his responsibility to tow the vehicle; it was to take [defendant] into custody. And what happened to the vehicle and the circumstances afterwards is not really known as a process as much as whether or not he had a basis to be where he was when he saw that object that he did; and therefore, the motion to suppress is denied.

"It was part of the community caretaking function when this person was placed under arrest, to inventory the vehicle and prepare it for towing so that the officer and the agency doesn't incur any other liability."

Subsequently, defendant moved under sections 995 and 1538.5, subdivision (i) to set aside the information on the ground that his motion to suppress should have been granted. The People opposed the motion. After hearing argument, the trial court denied the motion "because of the inventory search." The court explained further, "Officer Ambrose articulated the policy, articulated the reason. The defendant was the sole occupant of the car. He had no license. He was being arrested. The officer articulated the community caretaking policy, if you will. And you know, by denying the motion to suppress, the magistrate found that the officer's conduct was subjectively non-pretextual. So there is substantial evidence in the record to support that finding by the magistrate." The court continued, "And we don't have evidence one way or the other as to whether or not the inventory search was actually performed, but the decision to conduct it on the car initially was reasonable. [¶] . . . And there's no published case, that I'm aware of anyway, that requires that the CHP 180 form actually be filled out. I know it's a standard practice, but that doesn't mean without it an inventory search can't be justified. [¶] So the 995 motion is denied."

In May 2016, pursuant to a negotiated disposition, defendant entered a no contest plea to the weapon charge and was convicted on that charge. He preserved his right to raise the denial of his suppression motion on appeal.

4

The court subsequently sentenced defendant to three years in county jail pursuant to section 1170, subdivision (h). The court ordered that he serve six months in jail and be placed on mandatory supervision under section 1170, subdivision (h)(5) for the remainder of the time. The court also imposed various fees and fines.

Defendant filed a timely appeal based on the court's denial of his suppression motion.

## DISCUSSION

Defendant contends we must reverse the judgment because Officer Ambrose's warrantless search of his vehicle violated his constitutional rights against unreasonable search and seizure. He argues the trial court erred in rejecting his suppression motion because there was no evidence that Ambrose's search came within the "inventory search" exception to the constitutional prohibition against warrantless searches. The People assert only that we should affirm the judgment because police inevitably would have discovered the baton, which defendant argues also is not supported by substantial evidence. We agree with defendant.

### I.

### *Standard of Review*

When ruling on a motion to suppress, the trial court determines the facts, selects the rule of law, and applies the rule to the facts "in order to determine whether the law as applied has been violated." (*People v. Gonzales* (2011) 52 Cal.4th 254, 284.) "On appeal from a section 995 review of the denial of a defendant's motion to suppress, we review the determination of the magistrate at the preliminary hearing." (*People v. McDonald* (2006) 137 Cal.App.4th 521, 529.) We review the magistrate's resolution of the factual inquiry under the deferential substantial evidence standard. (*Gonzales*, at p. 284.) We defer to the magistrate's factual findings "when supported by substantial evidence, and view the record in the light most favorable to the challenged ruling." (*People v. Smith* (2011) 190 Cal.App.4th 572, 576.) We may affirm the magistrate's ruling if it "is correct on any theory of the law applicable to the case, even if the ruling was made for an incorrect reason." (*McDonald*, at p. 529.)

5

## II.

### *There Is Not Substantial Evidence That Ambrose Conducted an Inventory Search.*

Defendant argues there is not substantial evidence that Officer Ambrose's search of the vehicle was a valid inventory search pursuant to standardized department procedures. We agree.

Both the Fourth Amendment to the United States Constitution and the California Constitution prohibit unreasonable searches and seizures, including those conducted without warrants. Specifically, "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . ." (U.S. Const., 4th & 14th Amends.; Cal. Const., art. I, § 13; see *People v. Williams* (1999) 20 Cal.4th 119, 125 (*Williams*).) "The United States Supreme Court has interpreted the Fourth Amendment as requiring state and federal courts to exclude evidence that government officials obtained in violation of the amendment's protections. (*Mapp* [*v. Ohio* (1961)] 367 U.S. [643,] 655.) [¶] One of those protections is that a government official must obtain a warrant from a judicial officer before conducting a search or seizure." (*Williams*, at p. 125.)

"Warrantless searches are presumed to be unreasonable ' "subject only to a few specifically established and well-delineated exceptions." ' " (*People v. Evans* (2011) 200 Cal.App.4th 735, 742.) These are " 'exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with.' " (*Williams*, *supra*, 20 Cal.4th at p. 126.) "[T]he burden of proving the justification for the warrantless search or seizure lies squarely with the prosecution." (*People v. Johnson* (2006) 38 Cal.4th 717, 723.)

Courts have recognized an exception to the warrant requirement when the police take "an inventory of the contents of a vehicle" in the course of impounding it (*Williams*, *supra*, 20 Cal.4th at p. 126), commonly referred to as an inventory search. (See *South Dakota v. Opperman* (1976) 428 U.S. 364, 373–374 (*Opperman*).) Inventory searches are typically performed in the course of police impounding a vehicle "[i]n the interests of

public safety and as part of . . . 'community caretaking functions.' " (*Id*. at p. 368.) "When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody, [citation]; the protection [of] the police against claims or disputes over lost or stolen property, [citation]; and the protection of the police from potential danger." (*Id*. at p. 369.)

However, courts have "recognized the risk that police might use an inventory of this kind as a pretext for searching a vehicle for contraband or other evidence." (*Williams*, *supra*, 20 Cal.4th at p. 126.) A purported inventory search must not be a "pretext concealing an investigatory police motive" (*Opperman*, *supra*, 428 U.S. at p. 376) or "a ruse for a general rummaging in order to discover incriminating evidence . . . . The individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.' " (*Florida v. Wells* (1990) 495 U.S. 1, 4 (*Wells*).) In order to prevent such pretext searches, police discretion in performing an inventory search must be "exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." (*Colorado v. Bertine* (1987) 479 U.S. 367, 375.) "[A] valid inventory search must adhere to a preexisting policy or practice." (*Williams*, at p. 138 [citing *Wells*, at p. 4].) Further, "[t]he policy or practice governing inventory searches should be designed to produce an inventory." (*Wells*, at p. 4; *Williams* at p. 126, quoting *Wells*.)

California courts have rejected claims of purported inventory searches where the evidence does not show the search was conducted in accordance with an established policy or practice governing such searches or indicates the search was conducted for another purpose. (See *Williams*, *supra*, 20 Cal.4th at pp. 123, 138 [prosecution failed to meet burden of showing search was valid inventory search where prosecution failed to establish policy concerning search of closed containers and officers failed to complete inventory, questioning why need to inventory truck "mysteriously evaporate[d]" once

7

officers found drugs]; *People v. Torres* (2010) 188 Cal.App.4th 775, 782, 786–792 [rejecting prosecution's inventory search justification despite existence of inventory search policy where officer admitted he did not personally fill out CHP 180 form and made impound decision to facilitate inventory search so he could search truck for narcotics-related evidence]); *People v. Evans* (2011) 200 Cal.App.4th 735, 743, fn. 5 [search of air vents at impound yard not valid inventory search where not done pursuant to standardized inventory procedure and undisputedly done in effort to discover incriminating evidence].)

In *Williams*, the defendant, Williams, moved to suppress evidence of drugs that two deputies, Hunt and Oliver, found during a search of Williams's truck that the deputies conducted after Hunt stopped Williams for making an illegal turn. (*Williams*, *supra*, 20 Cal.4th at p. 124.) The drugs were contained inside closed leather bags on the front bench seat of Williams's truck. (*Id.* at p. 123.) The record indicated that the sheriff's department had a policy requiring deputies to inventory the contents of a vehicle before towing it, but there was no evidence the department had a policy about the opening of closed containers. (*Id.* at pp. 126–127.) Based on *Wells*, the court held that the prosecution was required to show that the deputies "were following some 'standardized criteria' or 'established routine' when they elected to open the containers [citation], and the record [there] fail[ed] to do so." (*Williams*, at p. 127.)

The primary issue in *Williams* was whether Williams's motion to suppress was specific enough to afford the prosecution notice of the grounds for the motion. But the court also elaborated on the prosecution's failure to meet its burden of proof and the importance of requiring it to do so. (*Williams*, *supra*, 20 Cal.4th at pp. 138–139.) The facts of the case, the court wrote, "underscore forcefully the reason behind [the] rule [that a valid inventory search must adhere to a preexisting policy or practice]. Deputy Hunt was surveilling defendant on suspicion of drug-related offenses and had called Deputy Oliver for assistance before defendant made the right turn without signaling. Deputy Hunt was likely looking for an opportunity to search defendant's truck. If he and Oliver truly intended to take an inventory pursuant to a preexisting policy or practice rather than

8

to search for drugs, why did they fail to complete the inventory? Why, when they found what they assumed to be drugs, did their need to inventory defendant's truck mysteriously evaporate? Having found the drugs, the police still needed to tow the truck, but apparently they were no longer very concerned about following policy. The inference is strong that they were never very concerned about following policy; Hunt opened the leather bags, not because he wanted to take an inventory pursuant to a preexisting policy, but because he suspected defendant of drug possession and wanted an excuse to 'rummage[e]' for evidence." (*Id*. at p. 138.)

Here, Ambrose testified it was standard police department policy for an officer to have a vehicle such as defendant's towed and inventoried when no one was present to take custody of it, it was standard procedure to fill out a CHP 180 form if the vehicle was towed, and the CHP 180 form contained a field in which one could inventory the items that were found in the towed vehicle. However, Ambrose did not testify that he was complying with these policies when he searched defendant's vehicle.[2] He simply testified that after placing defendant in the police car, he searched defendant's vehicle. He did not testify that either he or Sergeant Reeves, or the two of them jointly, had decided to have defendant's vehicle towed before he searched it. He did not testify that either of them arranged to tow the vehicle. And he testified that he did not know whether the vehicle was in fact towed or whether a CHP 180 form was ever prepared. He admitted he did not fill out a CHP 180 form, and no such form was offered in evidence by the prosecution, suggesting that no policy-compliant inventory search was ever completed. Nor was evidence offered that Ambrose referred in his police report to his having conducted an inventory search of defendant's vehicle or that his search had yielded nothing of value, even though the department's inventory search policy required

---

[2] Asked whether the department's policy of towing and inventorying unattended vehicles applied in this case, Ambrose did not respond directly, instead observing there were "a couple of different reasons to get in and search [defendant's] vehicle: One being inventory search and one being incident to the arrest that I was making."

9

officers to note and take custody of any "items of value."[3]  Finally, Ambrose testified that "[t]he vehicle had nothing to do with why I was there" and that he had "nothing to do with this traffic stop or anything to do with the CHP-180 [form], if there was one filled out."

On this record, there is no substantial evidence that Ambrose conducted an inventory search in accordance with standardized policies and procedures of the Fairfield Police Department.  With no evidence that the officers had considered whether, or decided, to impound defendant's vehicle, and if so the reasons for impoundment, the police's "community caretaking functions" were not implicated.[4]  Given the absence of this evidence and, further, given Ambrose's disclaimer of any responsibility for the vehicle, the traffic stop or the CHP 180 form, as well as the lack of evidence that he referred in any way to his search in his police report, there is no basis for inferring that Ambrose's search of defendant's vehicle was undertaken for the purpose of preparing an inventory.  As the United States Supreme Court and California Supreme Court have stated, "[t]he policy or practice governing inventory searches should be designed to

---

[3]  He stated that, "to ensure if there is [*sic*] any items of high value in the vehicle, that we are to note them—or, actually, take and put them into our custody for safekeeping, just so that when the vehicle is towed, it's not going to possibly become missing."  The People acknowledge that the policy required officers both to note and to take custody of any items of value.

[4]  When an inventory search is conducted based on a decision to impound, the impoundment itself must be warranted.  "Whether 'impoundment is warranted under this community caretaking doctrine depends on the location of the vehicle and the police officers' duty to prevent it from creating a hazard to other drivers or being a target for vandalism or theft.' " (*People v. Williams* (2006) 145 Cal.App.4th 756, 761; accord, *People v. Torres*, *supra*, 188 Cal.App.4th at pp. 787–789.)  Here, Officer Ambrose did not testify as to whether the car was located in a high crime area, illegally parked or otherwise posed a hazard to motorists or pedestrians.  Nor did he indicate whether the department's policy was to impound vehicles regardless of where they were located or how they were parked.  This raises further questions about whether the prosecution met its burden of proof to establish that the decision to impound, if any, and an inventory search resulting from impoundment, were called for by department policy and constitutionally reasonable.

10

produce an inventory." (*Wells*, *supra*, 495 U.S. at p. 4; *Williams*, *supra*, 20 Cal.4th at p. 126.) While it is possible that Ambrose conducted an inventory search of defendant's vehicle, "a mere possibility is nothing more than speculation. Speculation is not substantial evidence. [Citation.] ' "To be sufficient, evidence must of course be substantial. It is such only if it ' "reasonably inspires confidence and is of 'solid value.' " ' By definition, 'substantial evidence' requires *evidence* and not mere speculation. In any given case, one 'may *speculate* about any number of scenarios that may have occurred . . . . A reasonable inference, however, may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.' " ' " (*People v. Ramon* (2009) 175 Cal.App.4th 843, 851.) In short, the People did not present substantial evidence that Ambrose conducted an inventory search of defendant's vehicle pursuant to standard department policy.

## III.

### *There Is No Substantial Evidence That Police Inevitably Would Have Discovered the Baton.*

The People do not argue that Ambrose conducted an inventory search of defendant's vehicle. Instead, they contend we should affirm the judgment because, as the prosecutor argued below in the alternative,[5] the police inevitably would have discovered the baton in the course of an inventory search conducted after defendant's vehicle was towed. We conclude there is not substantial evidence to support the People's contention.

"[E]vidence that has been illegally obtained need not always be suppressed . . . ." (*Nix v. Williams* (1984) 467 U.S. 431, 441.) "[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative

_____

[5] The People contend that the magistrate ruled the baton inevitably would have been discovered when defendant's vehicle was impounded. We disagree. Instead, as we have discussed, the magistrate concluded that Ambrose conducted a proper inventory search of the vehicle.

11

evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." (*Id.* at p. 443.) Thus, such evidence may be admitted "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." (*Id.* at p. 444.)

"The prosecution must establish inevitable discovery without resort to speculation, for 'inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment.' " (*People v. Superior Court (Corbett)* (2017) 8 Cal.App.5th 670, 682, quoting *Nix v. Williams*, *supra*, 467 U.S. at p. 444, fn. 5.) Further, "[t]he inevitable discovery exception requires the court ' "to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred." ' " (*People v. Hughston* (2008) 168 Cal.App.4th 1062, 1072.)

The People point out that defendant "does not contend that he would have maintained control over his vehicle after the stop, or that the vehicle would not have been impounded." Further, "no one else was available to take the vehicle, so it is apparent that the car would have been towed and inventoried, and the baton would have been eventually found. The community caretaking function of keeping unlicensed drivers off the road, and of removing cars without drivers from the street, is clear." After noting that the baton was visible inside defendant's vehicle, the People conclude, "Thus, if Officer Ambrose had not detected the baton, personnel inventorying the car at the impound lot eventually would have." The People also emphasize Ambrose's testimony that department policy required officers to have a vehicle such as defendant's towed and inventoried and to note and place in custody for safekeeping any items of high value found in a vehicle.

The People's inevitable discovery argument fails because it requires us to build speculative inference on top of speculative inference. (See *People v. Raley* (1992) 2 Cal.4th 870, 890 [finding "these layers of inference far too speculative to support" a conviction].) First, as already discussed, the record is silent as to whether anyone even

12

considered towing the vehicle. There is no indication that Ambrose discussed with Reeves or anyone else whether the vehicle met the department's standardized criteria for a towing. Ambrose testified that there was no one in the area who could take custody of the vehicle, but this testimony is of little import if he had nothing to do with deciding whether to tow the vehicle, did not communicate his observations to anyone and left the scene before any decision about towing the vehicle was made. The record reveals nothing about the understanding of the officer apparently charged with this decision, Sergeant Reeves, of the department's standardized criteria for towing and inventorying or of whether the vehicle met these criteria. Reeves did not testify, and the record is silent, regarding the location of the vehicle at the time of defendant's arrest; we do not know, for example, if it was on a highway or in front of defendant's house. In light of this limited record, we can only speculate as to whether any decision was considered or made to tow defendant's vehicle according to standard department policy, and if any such decision would have been reasonable. (See note 5, *ante*.)

Second, there is no indication that the vehicle was actually towed. As we have discussed, Ambrose's testimony indicates that he was unaware of any decision to tow the vehicle, that he had nothing to do with considering such a question, and that he did not know whether or not the vehicle was ever towed. In light of this testimony, it would also be speculation to conclude the vehicle was actually towed.

It is possible that defendant's vehicle was towed but, again, a mere possibility does not rise to the level of substantial evidence. (*People v. Ramon*, *supra*, 175 Cal.App.4th at p. 851; see *People v. Evans*, *supra*, 200 Cal.App.4th at p. 756 [rejecting the People's inevitable discovery argument when, other than an impound manager's "oblique reference" to the usual practice of filling out a CHP 180 form, "there was no evidence presented regarding when, or whether, a separate inventory would have been conducted by police, or what the scope" of it would have been].) Therefore, we cannot affirm the trial court's order based on the People's inevitable discovery theory.

For the reasons we have stated, there is no substantial evidence to support the court's denial of defendant's suppression motion. The court should have granted the

motion because the People failed to meet their burden of establishing that the search of defendant's vehicle did not violate the warrant requirement of the Fourth Amendment and the California Constitution.

The court's error "is by its nature prejudicial" in this circumstance, where defendant pled no contest after the court's erroneous denial of his suppression motion. (*People v. Reyes* (2011) 196 Cal.App.4th 856, 864, citing *People v. Ruggles* (1985) 39 Cal.3d 1, 13.)  Therefore, he must be allowed, if he so chooses, to withdraw his no contest plea.

In light of our conclusions, we do not need to, and do not, address the remainder of the parties' arguments.

## DISPOSITION

The judgment is reversed and the cause is remanded with directions to the trial court to (1) vacate the order denying defendant's suppression motion and enter a new order granting the motion; (2) permit defendant to withdraw his no contest plea; (3) determine, if defendant does withdraw his plea, whether the People intend to retry the case; and (4) make such other orders as are necessary and appropriate.

_____

STEWART, J.

We concur.

_____

KLINE, P.J.

_____

MILLER, J.

*People v. Wallace* (A149049)

15

Trial Court:   Solano County Superior Court

Trial Judge:   Hon. E. Bradley Nelson

Counsel:

Anna Dorn, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Donna M. Provenzano, Supervising Deputy Attorney General, Masha A. Dabiza, Deputy Attorney General, for Plaintiff and Respondent.