Filed 3/8/24  P. v. Hepokoski CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>STEVEN MARCUS HEPOKOSKI,<br><br>     Defendant and Appellant. | A167527<br><br><br>(Solano County Super. Ct. No. VCR238361) |

Steven Marcus Hepokoski appeals after he pled no contest to possessing a firearm as a felon (Pen. Code, § 29800, subd. (a)(1))[1] and was granted probation.  He argues that his pre-plea motion to suppress was erroneously denied (§ 1538.5, subd. (m)).  We agree and reverse the judgment.

### BACKGROUND

### A.

Officer Christopher Francis of the Benicia Police Department testified at the preliminary hearing that, at about 10:00 p.m. on August 28, 2021, he was on patrol, with a police dog, in a marked patrol car.  Officer Francis saw Hepokoski, in a gas station parking lot, riding a motorcycle without wearing a helmet.

Officer Francis radioed dispatch that he was about to make a traffic stop at the gas station.  However, Hepokoski parked his

---

[1] Undesignated statutory references are to the Penal Code.

1

motorcycle in one of the gas station's parking spots in the interim. Thus, Officer Francis testified that "[t]here was no traffic stop," and he merely "contact[ed]" Hepokoski to talk to him about the dangers of riding a motorcycle without a helmet.

Officer Francis parked his patrol car about nine to 12 feet behind Hepokoski's parked motorcycle, which faced a concrete curb and, beyond that, a landscaped area. The adjacent parking stalls (to the left and the right) were open. The left-hand stall was similarly bordered on two sides by a concrete curb and landscaping. The area, where Hepokoski and a female companion were eating fast food and listening to music, was illuminated by two streetlights and the headlights of Officer Francis's patrol car.

Two additional officers, Corporal Woodlief and Officer Stafford, arrived. All three officers were in uniform. Officer Francis initially approached Hepokoski together with Corporal Woodlief, while Officer Stafford stood a few feet behind and recorded the interaction on his body camera.[2] Officer Francis stood no closer than two to three feet from Hepokoski. Corporal Woodlief and Officer Stafford both shined flashlights on Hepokoski and his motorcycle.

Officer Francis testified, "I believe one of the first things I asked about . . . was where is his helmet at or why isn't he wearing a helmet." Officer Francis then asked Hepokoski if he had his identification. At this point, the three officers stood around Hepokoski and his motorcycle in a triangle shape. Corporal Woodlief and Officer Stafford continued shining their flashlights on Hepokoski and his motorcycle. Corporal Woodlief was positioned towards the left of the motorcycle, standing on the concrete curb facing the open, left parking stall. Officer Francis

---

[2] The recording captures neither the officers' approach nor the audio for the first 30 seconds.

was positioned at the other end of the left parking stall, and Officer Stafford was standing towards the right of the motorcycle, in the open, right parking stall.

In response to Officer Francis's question about his identification, Hepokoski checked his pockets, moved around the parking spaces, and then started to eat again. The officers spoke to Hepokoski and his companion in a friendly tone about fires in El Dorado County and their recent evacuation. Hepokoski moved past Officer Francis on at least one occasion, and Officer Francis did not stop him. Corporal Woodlief also walked back and forth between the two open stalls.

Officer Francis testified that Hepokoski was not surrounded because "[there was] plenty of room for [him] to leave" on his motorcycle. Officer Francis eventually acknowledged that Hepokoski would not have been able to back straight out of the parking stall—because of where the patrol car was parked. Hepokoski's only way to exit would have been to back up the motorcycle as much as he could, turn its wheel to the left or right, go around Officer Francis or Corporal Woodlief, and drive out through the adjacent parking stall. Officer Francis said, "I would move."

After about a minute, Officer Francis asked a second time if Hepokoski had identification. When Hepokoski began looking in belongings secured to the motorcycle, Corporal Woodlief and Officer Stafford focused their flashlights on those items.

Hepokoski indicated that he would need to unload his belongings to locate his identification. Officer Francis said, "Yeah, absolutely. . . . I appreciate you offering." Shortly thereafter, Officer Francis pulled out a pad of paper and asked Hepokoski if he knew the number by heart. He also asked for Hepokoski's first and last name. Hepokoski told Officer Francis his name was "Steven Yancey."

3

After Officer Francis asked dispatch to run that name and the motorcycle's license plate, he was informed that "[t]here was no match on Steven Yancey" but that the motorcycle was registered to a Steven Hepokoski, who was on probation and subject to a "full search" condition. Dispatch also sent a photograph of the motorcycle's registered owner, which matched Hepokoski's appearance.

Officer Francis again asked Hepokoski what his last name was. Hepokoski repeated, "Yancey." Shortly thereafter, Officer Francis reminded Hepokoski that their interaction was being videotaped. At that point, Hepokoski admitted his true last name.

Officer Francis commanded Hepokoski and his companion to sit down on the curb. Asked to explain why he gave a false name, Hepokoski said, "I just wanted you guys to move along." After Hepokoski was placed under arrest, the officers searched a backpack on the motorcycle and found an unloaded gun.

### B.

Hepokoski moved to suppress the gun, along with his statements and the officers' observations, on the ground that the evidence was seized in violation of the Fourth Amendment to the United States Constitution. In its written opposition to the motion to suppress, the prosecution argued that Hepokoski's detention was supported by Officer Francis's reasonable suspicion that he violated Vehicle Code section 27803—by riding his motorcycle without a helmet—and that the subsequent search was lawful based on the officers' knowledge of his probation search condition.

At the preliminary hearing, the prosecution withdrew the former argument, acknowledging Vehicle Code section 27803 does not apply in a parking lot. (*Id.*, subd. (d).) Instead, the

4

People argued Officer Francis's interaction with Hepokoski began as a consensual encounter, not a detention.

The magistrate denied Hepokoski's motion to suppress. The magistrate expressly found that Officer Francis's patrol car was parked directly behind Hepokoski's motorcycle, but that Hepokoski was not blocked because there was "some room to back up and get around." The magistrate also stated that, while a "reasonable person would feel impinged by the position of" the patrol car, "the manner in which the officers positioned themselves was not so overbearing [or] intrusive that it undermined a reasonable person's ability to believe that they were free to go." The magistrate also stated, "there's nothing else whatsoever in the engagement between the officers and [Hepokoski] that appeared particularly coercive or investigatory."

The trial court later heard Hepokoski's motion to set aside the information (§ 995) on the same grounds. The trial court denied the motion after reviewing the evidence from the preliminary hearing. Hepokoski entered a plea of no contest to possession of a firearm by a felon (§ 29800, subd. (a)(1)). The trial court suspended imposition of sentence and placed Hepokoski on probation for two years.

## DISCUSSION

### A.

It is undisputed that Officer Francis had no reasonable suspicion Hepokoski was engaged in criminal activity before he gave a false name. Thus, the only question before us involves the timing of Hepokoski's detention. Hepokoski argues that his motion to suppress should have been granted because he was unlawfully detained as soon as Officer Francis parked his patrol car behind Hepokoski's motorcycle, the three officers approached with flashlights shining on him, and Officer Francis began questioning him. The People, on the other hand, contend that

5

Hepokoski was not detained until "after the police discovered he had lied about his identity and that he had a probation search condition." Although it is a relatively close question, we agree with Hepokoski.

**1.**

In reviewing a suppression ruling, we defer to the magistrate's factual findings, express or implied, if supported by substantial evidence. We then independently determine whether, on the facts so found, the search or seizure violates the Fourth Amendment, applying federal constitutional standards. (*People v. Tacardon* (2022) 14 Cal.5th 235, 242 (*Tacardon*).)

"For purposes of Fourth Amendment analysis, there are . . . three different categories or levels of police 'contacts' or 'interactions' with individuals, ranging from the least to the most intrusive. First, there are . . . 'consensual encounters' [citation], which are those police-individual interactions which result in no restraint of an individual's liberty whatsoever . . . and which may properly be initiated by police officers even if they lack any 'objective justification.' [Citation.] Second, there are what are commonly termed 'detentions,' seizures of an individual which are strictly limited in duration, scope and purpose, and which may be undertaken by the police 'if there is an articulable suspicion that a person has committed or is about to commit a crime.' [Citation.] Third, and finally, there are those seizures of an individual which exceed the permissible limits of a detention, seizures which include formal arrests . . . , and which are constitutionally permissible only if the police have probable cause to arrest the individual for a crime." (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784; accord, *In re Manuel G.* (1997) 16 Cal.4th 805, 821.)

Police "officers may approach someone on the street or in another public place and converse if the person is willing to do so. There is no Fourth Amendment violation [if the] circumstances

are such that a reasonable person would feel free to leave or end the encounter." (*People v. Rivera* (2007) 41 Cal.4th 304, 309.) In contrast, a detention occurs when the police, by physical force or show of authority, communicate to a reasonable person, in view of all the circumstances, that they are not free to leave, or otherwise terminate the encounter, and if the person actually submits to the show of authority. (*Tacardon, supra*, 14 Cal.5th at pp. 241-242; accord, *Florida v. Bostick* (1991) 501 U.S. 429, 439 (*Bostick*).) "The test's objective standard -- looking to the reasonable man's interpretation of the conduct in question -- allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment." (*Michigan v. Chesternut* (1988) 486 U.S. 567, 574.)

"Relevant circumstances may include: the presence of multiple officers, an officer's display of a weapon, the use of siren or overhead emergency lights, physically touching the person, the use of a patrol car to block movement, or the use of language or of a tone of voice indicating that compliance with the officer's request is compelled." (*Tacardon, supra,* 14 Cal.5th at pp. 241-242.) We also consider "the time and place of the encounter, whether the police indicated the defendant was suspected of a crime, whether the police retained the defendant's documents, and whether the police exhibited other threatening behavior." (*People v. Linn* (2015) 241 Cal.App.4th 46, 58 (*Linn*).) If the police uncover evidence during an illegal detention, the unlawfully obtained evidence generally must be suppressed as " ' "fruit of the poisonous tree." ' " (*People v. Kasrawi* (2021) 65 Cal.App.5th 751, 761.)

**2.**

Hepokoski's argument—that he was detained before the false identification came to light—is based on several factual assertions: (1) that Officer Francis's patrol patrol car blocked Hepokoski's exit; (2) that three officers were present and

7

surrounded him; (3) that Corporal Woodlief and Officer Stafford spotlighted Hepokoski with their flashlights throughout the encounter despite the area being well-lit; (4) that Officer Francis questioned him accusatorily about his failure to wear a helmet; and (5) that Officer Francis's repeated requests for his identification suggested he was required to comply. Hepokoski's first assertion is at odds with the superior court's express findings, which we are required to accept if supported by substantial evidence. (*Tacardon, supra,* 14 Cal.5th at p. 242.) Nonetheless, after independently applying the law to the magistrate's supported findings and other undisputed facts (*id.* at pp. 241-242, 255), we agree that a reasonable person in Hepokoski's position would have believed he was *not* free to leave or to otherwise terminate the encounter.

First, Hepokoski insists he was detained because Officer Francis's patrol car was parked behind his motorcycle. A detention is not established by the mere fact that an officer parks behind or near the defendant's vehicle, *if the defendant has room to drive away*. (See *Tacardon, supra*, 14 Cal.5th at p. 247; *People v. Perez* (1989) 211 Cal.App.3d 1492, 1494.) Here, the magistrate expressly found that Hepokoski was not blocked in and had "some room to back up and get around" Officer Francis's patrol car. These findings are supported by Officer Francis's testimony and the body camera recording. Hepokoski does not challenge the sufficiency of this evidence.

This is where our agreement with the magistrate's ruling ends. After finding that Hepokoski's ability to exit was not *physically* blocked, the magistrate explicitly stated, "there's nothing else whatsoever in the engagement between the officers and [Hepokoski] that appeared particularly coercive or investigatory." To the extent that this is a finding that no other circumstances indicate a show of authority to which an objectively reasonable person would feel compelled to submit, it is

8

contradicted by the undisputed facts.  (See *Tacardon, supra*, 14 Cal.5th at pp. 241-242, 251; *People v. Paul* (2024) 99 Cal.App.5th 832, 840 (*Paul*); *Linn, supra,* 241 Cal.App.4th at p. 58.)

Most importantly, it is undisputed that Officer Francis approached Hepokoski and initially asked "where is [your] helmet at or why [aren't you] wearing a helmet[?]"  "[Q]uestions of a sufficiently accusatory nature may *by themselves* be cause to view an encounter as a nonconsensual detention[,] . . . and the degree of suspicion expressed by the police is an important factor in determining whether a consensual encounter has ripened into a detention."  (*People v. Lopez* (1989) 212 Cal.App.3d 289, 292-293, italics added; accord, *Wilson v. Superior Court, supra,* 34 Cal.3d at pp. 790-791.)  Even without explicit mention of Vehicle Code section 27803, these questions would lead a reasonable person to believe that they were suspected of unlawful activity, and thus not free to merely leave or ignore Officer Francis's questions.  (See *Linn, supra*, 241 Cal.App.4th at pp. 58, 64-65.)

"The same is true for commands or directions issued in the course of an encounter."  (*Linn, supra*, 241 Cal.App.4th at p. 58.)  Here, Officer Francis testified that he merely asked if Hepokoski had his identification.  The body camera recording corroborates Officer Francis's account and shows that his tone was cordial.  The Fourth Amendment is not necessarily implicated when a police officer asks a person for identification, "*as long as the police do not convey a message that compliance with their requests is required.*"  (*Bostick, supra,* 501 U.S. at pp. 434-435, italics added; accord, *People v. Leath* (2013) 217 Cal.App.4th 344, 353.)  Here, unlike in *Bostick* and *Leath*, Officer Francis's repeated requests for identification came *after* he had communicated to Hepokoski that he was suspected of unlawful activity.  The distinction is crucial.  (See *Linn, supra*, at pp. 64-65 & fn. 7.)

Furthermore, Officer Francis repeated his request after Hepokoski gave an ambiguous response to the initial question

9

about identification. The first time he was asked, Hepokoski checked his pockets, moved around the parking spaces, and then resumed his meal. At this point, Officer Francis did not verbally inform Hepokoski, or otherwise indicate, that he was free to leave or to decline to answer his questions. (Cf. *Bostick, supra*, 501 U.S. at p. 432; *People v. Franklin* (1987) 192 Cal.App.3d 935, 941 ["citizen participant in a consensual encounter may leave, refuse to answer questions or decline to act in the manner requested by the authorities"].) Instead, Officer Francis repeated his request for identification—indicating to an objective person in Hepokoski's position that, although the officer's tone was polite and his voice was not raised, Officer Francis was not going to let the matter drop until he completed further investigation. Officer Francis's tone of voice alone does not determine whether Hepokoski was detained. (*Paul, supra*, 99 Cal.App.5th at p. 841 ["[i]f the officer's tone and words had been aggressive, it would be an additional reason for a reasonable person to believe that he or she was being detained" but "[t]he converse is not necessarily true"].)

Next, we consider the significance of Corporal Woodlief's and Officer Stafford's use of flashlights. At one point, there was a recognized split among the courts of appeal on whether an officer's use of a spotlight communicates the same show of authority as an officer's activation of emergency lights. (*Tacardon, supra*, 14 Cal.5th at pp. 243-245.) But our Supreme Court has since settled the question and decided that spotlights and emergency lights generally convey different meanings. (*Tacardon, supra,* at p. 246.) *Tacardon* explains: "[A] reasonable person would understand that spotlights can have a practical function that differs from the essentially communicative function of emergency lights. A spotlight can be used to illuminate the surrounding area for safety or other purposes unrelated to the projection of authority." (*Ibid.*)

10

*Tacardon* did not state a bright-line rule. We still "must consider the use of a spotlight together with all of the other circumstances. It is certainly possible that the facts of a particular case may show a spotlight was used in an authoritative manner. These may include flashing lights at the driver to pull the car over or attempting to blind the driver, which would be relevant considerations under the totality of the circumstances. [Citation.] But use of a spotlight, standing alone, does not necessarily effect a detention." (*Tacardon, supra*, 14 Cal.5th at p. 247.)

Here, the body camera recording shows two of the three officers (Woodlief and Stafford) using their flashlights to illuminate Hepokoski and his motorcycle from multiple angles. They did so even though the parking lot where Hepokoski parked was already illuminated by two streetlights *and* the headlights on Officer Francis's patrol car. In the absence of any other explanation, the only inference to be drawn is that the officers used flashlights as a display of authority that would lead an objective person to believe they were not free to leave. (See *Tacardon, supra*, 14 Cal.5th at p. 247 ["facts of a particular case may show a spotlight was used in an authoritative manner"]; *Paul, supra,* 99 Cal.App.5th at p. 840 [objective person would believe they were suspected of wrongdoing when two officers approached parked car from both sides and shined flashlights into it from both sides].)

The presence of three uniformed officers further heightened this show of authority. (See *In re Manuel G., supra*, 16 Cal.4th at p. 821; *In re J.G.* (2014) 228 Cal.App.4th 402, 412; but see *U.S. v. Drayton* (2002) 536 U.S. 194, 205 [additional officer's "position at the front of the bus . . . does not tip the scale in respondents' favor" when officer left aisle clear, did nothing to intimidate passengers, and said nothing to indicate exit was forbidden].)

11

Here, the magistrate explicitly found that the position of the three officers—in a triangle around Hepokoski—did *not* physically block his exit. In particular, the magistrate said that Corporal Woodlief's presence in the right parking stall, which led to the rest of the parking lot, was not "enough to cause a reasonable person to feel that they have no means of departure" because "there was an area available where [Hepokoski] was free to go." Nonetheless, we are required to independently consider the legal effect of the presence of multiple uniformed officers, positioned in a triangle around Hepokoski, for what was purportedly a casual conversation about helmet safety. (See *Tacardon, supra*, 14 Cal.5th at pp. 241-242; *Paul, supra*, 99 Cal.App.5th at p. 839 & fn. 2 [independently reviewing mixed question of whether trial court's findings support its legal conclusions].) While we defer to the magistrate's finding that Hepokoski's egress was not *physically* blocked by the three officers, we conclude their presence and position in adjacent parking spaces constituted a show of authority that communicated Hepokoski was not free to go. (See *Paul, supra*, at pp. 839-840 ["[a]n objective person would not believe that [they] were] free to simply start driving away with [a police officer] standing in the roadway"].)

True, backup officers, like spotlights, may serve an officer safety function, as opposed to a communicative function. (Cf. *Tacardon, supra*, 14 Cal.5th at p. 246.) But there is nothing in the record that suggests Hepokoski presented any danger to anyone but himself. And unlike in *U.S. v. Drayton, supra*, 536 U.S. at pages 204-205 and *I.N.S. v. Delgado* (1984) 466 U.S. 210, 216-218, which involved (respectively) passengers on a bus and workers in a factory, the presence of additional officers here is not explained by the sheer number of people that Officer Francis sought to question. (See *Michigan v. Chesternut, supra*, 486 U.S. at p. 573 ["what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only

12

with the particular police conduct at issue, but also with the setting in which the conduct occurs"].)

Officer Francis did not activate his emergency lights to pull over Hepokoski's motorcycle, touch him, or command him to stop. However, considering the totality of the undisputed circumstances—where Hepokoski was surrounded by three uniformed officers, immediately asked questions indicating suspicion he had engaged in unlawful activity, illuminated by multiple flashlights from multiple angles, and then repeatedly asked for his identification—a reasonable person would not believe this was an encounter that they were free to terminate. (See *Paul, supra,* 99 Cal.App.5th at pp. 839-841; *Linn, supra*, 241 Cal.App.4th at p. 65.)

The trial court erred by failing to consider the totality of the circumstances. (See *Tacardon, supra*, 14 Cal.5th at p. 241.) The harmless error rule is inapplicable and the judgment must be reversed. Hepokoski must be given the opportunity to withdraw his no contest plea. (See *Paul, supra,* 99 Cal.App.5th at p. 841; *People v. Wallace* (2017) 15 Cal.App.5th 82, 95.)

**3.**

The People recognize that, in some circumstances, evidence seized as a result of an unlawful search or seizure is not subject to exclusion "when the causal connection 'between the lawless conduct of the police and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint." ' " (*People v. McWilliams* (2023) 14 Cal.5th 429, 434.) However, they do not argue that the attenuation doctrine should apply here. (See *id.* at p. 438 [prosecution bears burden].) Accordingly, we need not address the issue further.

13

## DISPOSITION

The judgment is reversed, and the matter is remanded with directions to the trial court (1) to vacate its order denying the suppression motion and enter a new order granting the motion; and (2) to permit Hepokoski an opportunity to withdraw his no contest plea.


BURNS, J.

WE CONCUR:


SIMONS, ACTING P.J.
CHOU, J.

*P. v. Hepokoski* (A167527)