Filed 10/7/20  P. v. Gonzalez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>PEDRO ZAMBRANO GONZALEZ,<br><br>Defendant and Appellant. | F077427<br><br>(Super. Ct. No. BF169031A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Doris A. Calandra, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Pedro Zambrano Gonzalez (defendant) stands convicted, following a jury trial, of attempted murder (Pen. Code,[1] §§ 187, subd. (a), 664; count 1), torture (§ 206; count 2), robbery (§ 212.5, subd. (c); count 3), false imprisonment with violence (§ 236; count 4), carrying a loaded, unregistered firearm (§ 25850, subds. (a) & (c)(6); count 5), and possession of an assault weapon (§ 30605; count 7). The jury further found defendant personally used a firearm and inflicted great bodily injury (§§ 12022.5, subd. (a), 12022.7, subd. (a)) with respect to counts 1 through 4, and that he personally and intentionally discharged a firearm, proximately causing great bodily injury (§ 12022.53, subd. (d)), with respect to counts 1 and 3.[2] Defendant was sentenced to a total unstayed term of eight years four months plus 25 years to life, and ordered to pay restitution plus various fees, fines, and assessments.

We hold: (1) The conviction on count 2 is supported by sufficient evidence; (2) Defendant has failed to establish ineffective assistance of counsel based on trial counsel's failure to move to suppress evidence; and (3) Defendant is not entitled to have his monetary obligations vacated or stayed for want of an ability to pay finding. Accordingly, we affirm.

---

[1]     All statutory references are to the Penal Code unless otherwise stated.

[2]     The jury deadlocked on an allegation the attempted murder was committed with premeditation and deliberation. A mistrial was declared, and the allegation subsequently was dismissed. As contained in the information, count 5 charged a violation of section 25850, subdivision (a), while count 6 charged a violation of section 25850, subdivision (c)(6). On the prosecutor's motion, the information was amended so that the violation of section 25850, subdivision (c)(6) became an enhancement allegation appended to count 5. Count 6 was then dismissed.

2.

# FACTS[3]

## I

## JULY 6, 2017

### A. Discovery of the Victim

Late at night on July 6, a member of the housekeeping staff at Mercy Hospital in downtown Bakersfield was on a break near the ambulance bay, when she heard tires screeching.  A car fishtailed into the ambulance bay, then someone said, "[G]et him out of my car" or "[G]et out of my car."  The passenger door was flung open and a man was shoved out onto the street.  When the housekeeper reached him, she saw he was bleeding heavily.  He kept grabbing for the side of his head and saying he was shot.  The housekeeper ran into the emergency room to get help.

The injured man was Michael R.  He was suffering from multiple gunshot wounds.  He had injuries to his head, knees, shoulder, foot, and ankle.  As of the time of trial, he had scars on the back, top, and side of his head.  He was told that two bullets grazed his head, while the other head injuries were from an object.  It took approximately 17 staples to close the head wounds.  He was shot in the shoulder, and the bullet remained in his body as of the time of trial.  There were three bullet wounds in each knee, and he had a lot of glass cuts to, and glass still in, both knees.  Two bullets went through his left ankle, necessitating surgery to insert metal plates.  It took Michael four and a half to five months to walk again, and he would never be able to run.  The pain was "[t]remendous."  As of trial, he was still in constant pain.

---

**3**    Unspecified dates in the statement of facts are to the year 2017.

Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names.  No disrespect is intended.

**B.    Michael's Trial Testimony**

Michael met Jose Z. one time. He did not know Jose's brother — defendant — although he knew of him. He had never seen defendant outside of court proceedings.

Sometime prior to July 6, a woman borrowed $1,200 from Jose, but gave it to Michael to hold. Michael was supposed to take it to a bail bond agent for someone else.

The shooting occurred at a house in the 1200 block of 3rd Street in Bakersfield. Michael's car had been stolen, and he had put up a reward for it. A girl he knew said that if he went to that house, the people there knew the girl who had stolen the car and could get her to come over to the house. Michael had been to the house once before. There were always several people there. Michael spoke to defendant by phone just before going to the house. He did not recall what defendant said, but "assume[d]" the conversation was about the stolen car.

When Michael arrived at the house, neither Jose nor defendant was there. When Michael went inside, two men entered behind him. He immediately knew something was wrong. He reached for the door handle so he could leave and was struck in the back of the head with a small pistol — possibly .22-caliber — by a Black male. The other person was an overweight Hispanic male called "Gordo." Michael was unable to get through the screen door, then the gun was in his face and the man holding the gun told him to sit down. Michael sat on the couch in the living room. This was the only gun he saw at that point, but later, he saw a third man with a gun. This person, who was already inside the house, was not defendant. Michael did not recognize him.

Gordo tied Michael's legs with an Ethernet cable or extension cord, while the Black man held the gun to Michael's face. The men asked Michael to empty his pockets. Michael gave up everything in his pockets, which was about $2,200 to $2,500 in cash. Meanwhile, the third man was going around the house, grabbing items and putting them in a backpack.

4.

Michael asked if there was anything else he could give them to make them let him go. He took out his cell phone and said he could call and have any amount of money there that they wanted. Gordo took the phone and threw it. Michael gave them a diamond ring worth about $15,000, and proposed they take it and let him go.

Michael believed he was tied up for about 15 minutes. He thought he was conscious the entire time, but there were "blur spots" he did not remember. He thought he tried to get away. Somehow, he ended up between the living room and the kitchen, with the Black man hitting him in the head with a guitar while Michael was on the ground with his legs tied. The third person pulled a larger gun out of the backpack. Michael believed it was a .40- or .45-caliber Glock. It was a black semiautomatic with a white sight and a big barrel.

The third time the Black man struck Michael with the guitar, the instrument hit Michael in the mouth and broke in half. The man with the Glock was "doing his own thing" and not paying attention. When he got too close to Michael, Michael tried to grab the gun, and he and the other men ended up in a "dog pile" with Michael on top of one of the men and underneath the other two. Michael bit the third person's hand to get the Glock.

After that, they "[f]ought back and forth with hands." There was a lot of blood. When Michael got the gun, the clip was ejected. He pushed the clip back in and tried to pull the slide back to chamber a round so he could shoot, but it was too slimy from blood. Michael did not know if he had been shot by then, but he felt blood coming down the side of his head. The Black man fired at him "point blank" while they were in the dog pile.

At some point, Michael got under the table and then made his way to the sliding glass door in the kitchen. He did not recall that part, or how the person with the backpack ended up with the Glock again. The sliding glass door was locked, so Michael tried to break it with something. He could feel himself getting shot by the Black man with the smaller gun. The man with the Glock shot him in the ankle. Michael did not know

5.

which round went through the glass door, but the glass shattered. He was fairly sure the Glock was fired twice.

Michael tried to stand, but his ankle would not hold his weight, causing him to fall back down on top of the glass. He pushed the glass out and crawled across it into the back or side yard. His legs were still tied. Once he got outside, the only way to free his legs was to take off his pants. Once he did that, he crawled to the gate in the fence, only to find it also was locked. He managed to pull himself to the top of the six- to eight-foot fence, then flipped himself over and crawled another 45 feet or so to where the car that had brought him to the house was waiting. The driver took him to a hospital, from which he was transferred to Kern Medical Center (KMC).

At one point while he was at KMC, Michael thought his father was with him, but it was Bakersfield Police Detective Pair. Michael told Pair what happened and that it could have been defendant who inflicted the injuries. The identification was based on an assumption as to whom Michael was supposed to meet at the house. Michael did not really recall what occurred while he was being treated. He told Pair that defendant was Jose's brother, and that the house where everything happened was on 3rd Street. Michael did not recall Pair showing him a photographic lineup.

Michael was certain the third person was not defendant. Michael was not afraid of defendant or Jose. He had no reason to be. He identified defendant at the preliminary hearing on July 28, but Pair threatened him. He did not recall what he said at the preliminary hearing.

C.      **Law Enforcement and Related Testimony**

At approximately 10:00 p.m. on July 6, Bakersfield Police Officer Hamma responded to Mercy Hospital regarding a report of an assault with a deadly weapon. When he arrived, he was informed the victim was being transported to KMC for treatment. Hamma then followed the ambulance to KMC. Once Michael was taken out

6.

of the ambulance, Hamma asked who assaulted him.[4] Michael responded that it was "Pedro," Jose's brother. He also gave what he believed to be their last name and where they lived on 3rd Street. Michael said he had gone there, and they tied him up and took his money. Pedro took his phone and shattered it. Pedro shot him. Michael described Pedro, and said "Gordo" and a Black man Michael did not know were involved. After, they took off running. At no time during the conversation did Michael appear uncertain as to who shot him. During the conversation, he lapsed in and out of consciousness or sleep at least once.

Bakersfield Police Officer Hardin also spoke with Michael at KMC.[5] Michael said "Pedro" had done this to him. He did not give a last name. He said Pedro kicked him in the face, and identified Pedro, possibly Gordo, and a Black man as the ones involved in the incident. Michael said he had borrowed money from Jose to help another friend, and they took well over $1,200 from him that night. Pedro kept saying that he had told Michael to have the money ready. Michael kept telling him that he had the money in his pocket, but "[t]hey still only wanted to do is . . . tie [Michael] up and fuck [him] up."

Bakersfield Police Officers Celedon and Jauch responded to the 1200 block of 3rd Street to attempt to locate the crime scene. Celedon observed a trail of what appeared to be dried blood leading from the sidewalk up the driveway of a house to the east portion of the fence that led to the rear yard. Jauch obtained a key from a neighbor, allowing the officers to gain entry through the chained security door at the front of the house. Inside, there was damage throughout the house, including a shattered sliding glass door in the kitchen from which a chain was hanging and away from which the blood trail led. There was also fresh, wet blood on the floors of the living room and kitchen. Officers did not find anyone inside.

---

**4**　　A recording of the conversation was played for the jury.

**5**　　A recording of the conversation was played for the jury.

Officers obtained a search warrant and reentered the house approximately 30 to 45 minutes later. Among items seized in the search were blood samples, two spent .45-caliber shell casings, a bullet fragment, a cell phone, and a cracked guitar with dried blood on the bottom. The guitar weighed an estimated 10 to 15 pounds. A pair of blood-stained jeans was found in the area of the fence. DNA results showed Michael could not be excluded as the source of the blood on the guitar and found elsewhere at the scene.[6]

Pair interviewed Michael at KMC on the afternoon of July 7.[7] During the interview, Michael looked disheveled and was writhing in pain, although he was coherent. Pair explained that he wanted to show Michael some pictures, to see if Michael could identify the person responsible. When Pair asked if Michael felt he was in the right state of mind to be able to do that, Michael answered affirmatively. He said the person who did it was named Pedro. Shown a photographic lineup, Michael said number one looked like him the most, but "fatter." Michael agreed with Pair's interpretation that Michael was saying if number one was skinnier, it would be Pedro. Michael said he knew him "real well." Defendant was in the number one position in the photographic lineup.

Pair related some of Michael's testimony at the preliminary hearing. At that hearing, Michael said he believed his life was in danger. Defendant and Jose had control over him, and he had been threatened by men sent by defendant to collect the debt owed by Michael to defendant and Jose. Michael contacted defendant before going to the

---

[6] The criminalist who performed the DNA analysis testified to the random match probability, which is the type of statistic used when comparing DNA profiles. In each instance, she did not testify that someone was the source of particular DNA, but rather that he could or could not be excluded as a source. In most instances in which she testified someone could not be excluded, she also testified that the probability that a random person in the population would have the DNA profile detected in the sample tested was one in the trillions or more, i.e., more than the population of the planet.

[7] A recording of the interview was played for the jury.

house on 3rd Street on July 6. At the preliminary hearing, Michael identified defendant and said he was at the house when Michael arrived. Defendant gave the order to tie Michael's legs and held a "Glock-40" to Michael's head. Defendant reached into Michael's pockets and took his money. Michael described defendant as being angry during the incident at the house. Defendant said he had already sent two people for the money, and he was upset about the length of time it took for payment. Defendant said he also owed people money and was being threatened for it. Defendant took Michael's cell phone, threw it, and shot Michael twice in the leg. Defendant was not aiming at the leg; he was aiming at Michael and hit him in the leg. Michael also testified at the preliminary hearing that the photograph in the number one position was the one of the six photographs that was most like defendant. The photograph was not recent enough for Michael to be positive, because defendant was a lot skinnier now.

## II

## JULY 12, 2017

At approximately 2:00 a.m. on July 12, Bakersfield Police Officers Glenn and Schinler drove their respective patrol vehicles into the parking lot of the Vagabond Inn on Panama Lane, just east of Freeway 99. As Glenn entered the parking lot, he saw a car immediately exit the lot and leave the area at a high rate of speed. The officers followed the car onto the freeway, then, when it exited, Schinler made a traffic enforcement stop.

Before the officers approached the vehicle, Glenn noticed some fidgeting on the driver's side. He could see the silhouette of two heads inside the car. The driver's head was going down and up as if he was picking something up or putting something down. As Schinler approached the driver side door, Glenn observed the driver, subsequently identified as defendant, start to take his hands from the steering wheel and go underneath the seat. Glenn ordered him to put his hands back on the steering wheel.

Schinler obtained the names of the vehicle's occupants. Both were subject to outstanding warrants. They were taken into custody and placed in officers' vehicles. A

9.

search of the car revealed a .45-caliber ACP handgun, containing nine live rounds, under the driver's seat and an AK-47-type assault rifle with a detached magazine, containing 26 live rounds, in a guitar case in the trunk. Neither gun was registered.[8]

DNA analysis showed neither defendant nor Michael could be excluded as sources of the DNA obtained from the .45-caliber handgun. Michael was excluded as a possible contributor to the DNA obtained from the AK-47, while defendant could not be excluded. Firearm testing showed the spent cartridge casings found at the crime scene were fired by the .45-caliber pistol. The firearm examiner was unable to determine whether the bullet fragment came from that firearm, although the fact it was copper jacketed rather than copper washed made it more consistent with being a .45-caliber round than .22-caliber round.

## DISCUSSION

### I

#### SUFFICIENCY OF THE EVIDENCE

Defendant contends the evidence is insufficient to sustain his conviction for torture (count 2). We conclude otherwise.

The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421,

---

[8]     Pair was familiar with the .45-caliber handgun. It was very similar in appearance to a Glock .40-caliber handgun.

425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). "If the circumstances reasonably justify the [trier of fact's] findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) Instead, reversal is warranted only if "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

Section 206 provides, in pertinent part: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture." Torture thus "has two elements: (1) the infliction of great bodily injury; and (2) the specific intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose. [Citation.]" (*People v. Massie* (2006) 142 Cal.App.4th 365, 370-371.)

Defendant first contends the evidence failed to establish he inflicted great bodily injury during the alleged torture. Defendant argues there were two discreet assaults on Michael, the first when he was held captive and was hit, kicked, and struck with a guitar; and the second when he was shot while trying to escape. Because only the shooting resulted in great bodily injury, the argument runs, the great bodily injury did not occur during the alleged torture.

Great bodily injury, as defined in section 12022.7, "means a significant or substantial physical injury." (§ 12022.7, subd. (f).) It is injury that is "not insignificant, trivial, or moderate. [Citation.]" (*People v. Armstrong* (1992) 8 Cal.App.4th 1060,

11.

1066.)  " 'Abrasions, lacerations and bruising can constitute great bodily injury. [Citation.]' " (*People v. Hale* (1999) 75 Cal.App.4th 94, 108.)

Torture can be committed by a course of conduct. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1429.)  When such is the case, "it is not necessary that any single act in the course of conduct results in great bodily injury.  Rather, if the requisite intent exists and the cumulative result of the course of conduct is great bodily injury, the crime of torture has been committed.  [Citation.]" (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1043; accord, *People v. Hamlin*, *supra*, at p. 1429.)  Moreover, "[t]he statutory definition of torture does not require a direct use of touching, physical force, or violence, but instead is satisfied if the defendant, *directly or indirectly*, inflicts great bodily injury on the victim." (*People v. Lewis* (2004) 120 Cal.App.4th 882, 888, italics added.)  In other words, a defendant can be convicted of torture as an aider and abettor. (*Id*. at p. 889.) "Section 206's reference to section 12022.7 . . . does not give defendant an opening to argue that section 206 requires defendant to have personally inflicted the torture in the same way that section 12022.7 requires there be personal infliction of injury for the statute to operate." (*Id*. at pp. 888-889, fns. omitted.)

In the present case, there was evidence of blood in the immediate entryway of the residence, substantiating Michael's testimony that he was hit in the head as soon as he entered.  Michael testified at the preliminary hearing that defendant gave the order to tie his legs.  A reasonable inference can be drawn from Michael's trial testimony that he was already bleeding badly by the time of the struggle over the larger caliber firearm. Celedon estimated the guitar, with which Michael had been struck in the head, was heavy, weighing 10 to 15 pounds.  Jurors were shown photographs of Michael's injuries, and were instructed on aiding and abetting principles.[9]

---

[9]    The photographs, exhibits 2 through 11, have been transmitted to this court, and we have viewed them.

In light of the foregoing, jurors reasonably could have concluded the torture in this case was committed by a course of conduct, and that defendant inflicted great bodily injury during the torture, either as a direct perpetrator or an aider and abettor. The fact the trial court, in denying defendant's section 1118.1 motion, appears to have agreed with defendant that great bodily injury was not inflicted until the struggle over the gun, is immaterial. The question for the trial court in ruling on the motion was " ' "simply whether the prosecution ha[d] presented sufficient evidence to present the matter to the jury for its determination." [Citation.]' " (*People v. Dalton* (2019) 7 Cal.5th 166, 249.) The jury was in no way bound by the trial court's reasoning. "[D]etermining whether a victim has suffered physical harm amounting to great bodily injury is not a question of law for the court but a factual inquiry to be resolved by the jury. [Citations.] ' "A fine line can divide an injury from being significant or substantial from an injury that does not quite meet the description." ' [Citations.] Where to draw that line is for the jury to decide." (*People v. Cross* (2008) 45 Cal.4th 58, 64.)

Defendant further contends there was insufficient evidence of the requisite intent. He says the evidence showed that at the time Michael was shot, defendant was acting with intent to kill, not the intent required for a conviction of section 206, i.e., "the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose . . . ."

This argument is founded on the erroneous premise that jurors were required to find great bodily injury was not inflicted until Michael was shot by defendant. Whatever defendant's intent at the moment he shot Michael, there was substantial evidence his intent during the course of events was to cause cruel and extreme pain and suffering for the purpose of revenge or some sadistic purpose.

" 'Intent is a state of mind. A defendant's state of mind must, in the absence of the defendant's own statements, be established by the circumstances surrounding the commission of the offense.' [Citations.]" (*People v. Baker* (2002) 98 Cal.App.4th 1217,

1223.) Although undue weight should not be given to the severity of the victim's wounds because severe injuries may be consistent with a desire to kill, heat of passion, or an explosion of violence (*People v. Mungia* (2008) 44 Cal.4th 1101, 1137), the nature and extent of the injuries inflicted nevertheless may be considered in assessing intent (*People v. Pre* (2004) 117 Cal.App.4th 413, 424).

The evidence presented at trial was such that jurors reasonably could conclude defendant had Michael tortured as revenge for taking too long to repay the money Michael owed, thereby causing defendant to be pressured by those to whom he himself was in debt. Jurors also reasonably could conclude defendant harbored a sadistic purpose that went beyond merely securing repayment of the money, based on evidence defendant and his cohorts continued their injurious actions after they took money and property (the ring) worth more than Michael owed.[10] As Michael told Hardin, "I kept telling [Pedro], like: 'Dude, I got the money in my pocket. What the fuck is your problem?' They still only wanted to do is fucking tie me up and fuck me up."

Substantial evidence supports defendant's conviction of torture.

## II

### INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends his trial attorney's performance was constitutionally defective with respect to count 7, because counsel failed to move to suppress the AK-47 found following defendant's arrest. Defendant concedes the vehicle stop, arrest, and search of the passenger compartment of the vehicle were lawful. He argues, however, that the warrantless search of the trunk, which included opening the closed guitar case, was unlawful. We conclude defendant has failed to establish ineffective assistance of counsel.

---

**10** A "sadistic purpose," as used in section 206, is " 'the infliction of pain on another person for the purpose of experiencing pleasure' [citation]." (*People v. Aguilar* (1997) 58 Cal.App.4th 1196, 1203.) It need not be sexual in nature. (*Ibid.*)

The applicable law is settled.  The burden of proving ineffective assistance of counsel is on the defendant.  (*People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.)  "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings.  [Citations.]  'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'  [Citations.]"  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.)

"To make a showing of constitutionally inadequate representation by counsel when failure to seek suppression of evidence on a Fourth Amendment ground is asserted as the basis for the ineffective counsel claim, the party must establish that the Fourth Amendment claim had merit and that it is reasonably probable that a different verdict would have been rendered had the evidence been excluded.  [Citations.]"  (*People v. Coddington* (2000) 23 Cal.4th 529, 652, superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1107, fn. 4 & overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

The parties discuss whether the search and opening of the guitar case could be justified as a search incident to arrest and/or on the basis of probable cause to believe there was contraband or evidence of a crime inside the vehicle.  (See, e.g., *Arizona v. Gant* (2009) 556 U.S. 332, 335, 347; *People v. Lee* (2019) 40 Cal.App.5th 853, 861.)  Glenn testified he and Schinler were conducting an inventory search, because the vehicle was going to be towed.

Because defendant had been arrested, Glenn and Schinler had authority under state law to impound the vehicle. (*People v. Redd* (2010) 48 Cal.4th 691, 721; see Veh. Code, § 22651, subd. (h)(1).) Having decided to impound the vehicle, the officers had authority to conduct an inventory of the vehicle's contents " 'aimed at securing or protecting the car and its contents.' [Citation.]" (*People v. Redd*, *supra*, at p. 721, fn. omitted; see *Colorado v. Bertine* (1987) 479 U.S. 367, 381; *South Dakota v. Opperman* (1976) 428 U.S. 364, 368-369; *People v. Zabala* (2018) 19 Cal.App.5th 335, 340.) In order to be reasonable under the Fourth Amendment, however, such a search and the opening of any containers cannot be a pretext for an investigatory purpose and must adhere to preexisting policy or practices. (*Florida v. Wells* (1990) 495 U.S. 1, 4-5; *People v. Zabala*, *supra*, 19 Cal.App.5th at p. 341; *People v. Wallace* (2017) 15 Cal.App.5th 82, 90.)

Here, no evidence was presented at trial concerning the existence of, or conduct of the search pursuant to, any preexisting policy or procedures. From this, defendant concludes there is a reasonable probability that had his trial attorney brought a suppression motion, the AK-47 assault rifle would have been suppressed; hence, his conviction on count 7 must be reversed.

We disagree. While, when a defendant has sought suppression of evidence, the prosecution bears the burden of demonstrating a legal justification for a warrantless search, which is presumed to be unreasonable under the Fourth Amendment (*People v. Simon* (2016) 1 Cal.5th 98, 120), defendant's claim here is ineffective assistance of counsel. On that, as we have said, defendant bears the burden. (*People v. Pope*, *supra*, 23 Cal.3d at p. 425.)

We cannot tell, from the record on appeal, whether a suppression motion would have had merit. Evidence concerning the existence of any standardized criteria for inventory searches would have been irrelevant at trial, since the search was never challenged.

"If the record contains no explanation for [counsel's] challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 367.) In other words, "in assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal*, competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice. [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260, original italics.)

Because the record on appeal does not show why the search was never challenged, defendant is not entitled to reversal on direct appeal unless counsel simply could have had no satisfactory explanation for failing to bring a suppression motion. No such finding can be made; for all the record before us shows, counsel knew the police department had the required standard criteria and policy, and the officers acted pursuant thereto so that a motion inevitably would have failed. "Counsel is not ineffective for failing to make a frivolous motion." (*People v. Weaver* (2001) 26 Cal.4th 876, 931.)

Based on the record before us, we can ascertain neither deficient performance nor prejudice.[11] Accordingly, defendant has failed to bear his burden of establishing ineffective assistance of counsel.

## III

### ABILITY TO PAY FEES, FINES, AND ASSESSMENTS

As previously described, defendant was sentenced to a total unstayed term of eight years four months plus 25 years to life in prison. The court ordered him to pay the statutory minimum restitution fine of $300 (§ 1202.4), and imposed and stayed a $300 parole revocation fine (§ 1202.45). The court also imposed an additional $10 fine for

---

[11]  This case therefore differs significantly from *People v. Jones* (2010) 186 Cal.App.4th 216, 243-244, on which defendant relies.

robbery (§ 1202.5), a court operations assessment of $240 (§ 1465.8), and a court facilities funding assessment of $180 (Gov. Code, § 70373). Defendant did not object to any of these amounts.[12]

Defendant contends the trial court improperly imposed these fees, fines, and assessments without determining whether he had the ability to pay them, in violation of his due process and Eighth Amendment rights. Accordingly, he says, the monetary obligations must be stricken or stayed unless and until the People prove defendant has the present ability to pay them.[13] Defendant's argument is based largely on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, which was decided after his sentencing hearing. *Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before it imposes any fines or fees. (*Id.* at p. 1164; accord, *id.* at p. 1167; see *People v. Castellano* (2019) 33 Cal.App.5th 485, 488-490.)

We conclude defendant is not entitled to relief.

First, under an Eighth Amendment analysis, the fines, fees, and assessments imposed in this case are not grossly disproportionate to defendant's level of culpability and the harm he inflicted. Accordingly, they are not unconstitutionally excessive. (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1072 (*Aviles*).)

Second, the situation presented in *Dueñas* is markedly distinguishable from the facts of defendant's case. (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1054-1055

---

[12]     Although sentence on counts 2, 3, and 4 was imposed but stayed pursuant to section 654, the trial court properly imposed the assessments on those counts. (*People v. Sencion* (2012) 211 Cal.App.4th 480, 483-484; *People v. Crittle* (2007) 154 Cal.App.4th 368, 370-371.)

[13]     The question whether a court must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments and, if so, which party bears the burden of proof regarding the defendant's ability to pay, is currently pending before the California Supreme Court. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

(*Lowery*); see also *People v. Son* (2020) 49 Cal.App.5th 565, 599-601 (conc. & dis. opn. of Franson, A.P.J.) (*Son*).) Assuming we were to find *Dueñas* applies despite these differences, we would nonetheless reject defendant's constitutional claims for the reasons stated in *Lowery*, *supra*, 43 Cal.App.5th at pages 1056 through 1057 (no due process violation), 1057 through 1058 (no gross disproportionality under 8th Amend. to U.S. Const.), and 1058 through 1060 (no equal protection violation).[14]

We would further find that any error in the trial court's failure to conduct a hearing on defendant's ability to pay was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *Aviles*, *supra*, 39 Cal.App.5th at p. 1075.) According to the undisputed statements in the probation officer's report, defendant is relatively young (age 35 at the time of sentencing) and in good health. We can infer he has the ability to pay the aggregate amount of $730 imposed in this case from probable future wages, including prison wages, while he serves his lengthy prison term. (*Lowery*, *supra*, 43 Cal.App.5th at p. 1060; *Aviles*, *supra*, 39 Cal.App.5th at pp. 1076, 1077; accord, *Son*, *supra*, 49 Cal.App.5th at pp. 603-604 (conc. & dis. opn. of Franson, A.P.J.).) While it may take defendant some time to pay the amounts imposed in this case, that circumstance does not support his inability to make payments on his monetary obligations from either prison wages or monetary gifts from family and friends

---

[14] We would not find forfeiture, since defendant lacked the statutory ability to object to the monetary obligations imposed at the sentencing hearing. Section 1202.4, subdivisions (c) and (d) only permit a party to raise an ability to pay objection when the court imposes a restitution fine above the statutory minimum. Since the court imposed the minimum restitution fine in the present case, defendant lacked the statutory ability to object under the governing law at the time of his sentencing hearing. (See *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153-1154.) In addition, the statutes that authorize the imposition of the court operations and facilities fees and assessments do not, on their face, permit a defendant to make any kind of ability to pay objection. (§ 1465.8, subd. (a)(1); Gov. Code, § 70373, subd. (a)(1); but see *People v. Crittle*, *supra*, 154 Cal.App.4th at p. 371 [failure to object forfeits ability to pay claim with respect to fine imposed pursuant to § 1202.5].)

during his prison sentence.  (See, e.g., *People v. Lewis* (2009) 46 Cal.4th 1255, 1321; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505.)

## **<u>DISPOSITION</u>**

The judgment is affirmed.

DETJEN, J.

WE CONCUR:


LEVY, Acting P.J.


FRANSON, J.